In re Jack C. BENUN, Debtor.

Fuji Photo Film Co., Ltd., Plaintiff,

v.

Jack C. BENUN, Defendant.

Bankruptcy No. 03–32195 (MS). Adversary No. 03–2615 (MS).

United States Bankruptcy Court, D. New Jersey.

Feb. 29, 2008.

Lawrence Rosenthal, Esq., Matthew W. Siegal, Esq., Angie M. Hankins, Esq., Stroock, Stroock & Lavan, LLP, New York, NY, for Plaintiff, Fuji Photo Film Co., Ltd.

Bruce Buechler, Esq., Lowenstein Sandler PC, Roseland, NJ, for Plaintiff, Fuji Photo Film Co., Ltd.

Dennis O'Grady, Esq., Joseph L. Schwartz, Esq., Seth H. Lieberman, Esq., Kevin J. Larner, Esq., Riker Danzig Scherer Hyland & Perretti, LLP, Morristown, NJ, for Defendant, Jack C. Benun.

## *OPINION*

MORRIS STERN, Bankruptcy Judge.

## *TABLE OF CONTENTS*

I. Background .......................................................... 65

II. Pretrial Motions .................................................... 68

III. Scope of Trial ...................................................... 70
 A. Tranche I (1995 through August 21, 2001) ............................ 71
 1. District Court I Judgment ........................................ 71
 2. Issue Preclusion ................................................. 73
 3. Factors Deemed Persuasive In Limiting the Scope of Trial ............. 75
 (a) "Willful" As Defined in Bankruptcy and Patent Law ................ 75
 (b) The Malice Requirement of § 523(a)(6) ........................... 78
 (c) District Court Refusal to Enhance Damages and the Federal
 Circuit's Comments in Appeal II ................................. 80
 (d) The Repair Defense ............................................ 81
 4. This Court's Review of Pretrial Submissions ......................... 81
 5. Conclusion—Scope of Trial of Tranche I Issues ...................... 82
 B. Tranche II (August 21, 2001 to December 12, 2003) Issue Preclusion ...... 83
 C. Trial Issues ....................................................... 85

IV. Tranche II (August 21, 2001 to December 12, 2003): Claims of Patent
 Infringement, Inducement to Infringe, and Willful and Malicious Injury to
 Property per § 523(a)(6) .............................................. 85
 A. Evidence Issues .................................................... 85
 B. Process of Refurbishing LFFPs ...................................... 85
 1. Effort to Establish a Standard for Permissible Repair Processing ...... 85
 2. Proof Required to Establish "Permissible Repair" Process ............. 88
 3. Determination as to Processing .................................... 90
 C. First Sale Requirement ............................................. 95
 D. Conclusion as to Infringement ...................................... 100
 E. Whether Fuji Established Benun's Willful and Malicious Injury to its
 Property for Purposes of § 523(a)(6) Exception to Discharge in
 Tranche II ........................................................ 102

1. Burden of Persuasion......................................102
2. Process of Repair .......................................102
3. First Sale ...........................................103
 (a) Factors Considered................................103
 (b) Evaluation of Factors .............................106
 (c) Findings Regarding Willful and Malicious Injury in Tranche II.....106
 (d) Summary of Tranche II "Willful and Malicious" Findings ...........108
4. Calculation of Portion of Tranche II Judgment Excepted from
 Discharge..........................................109
 (a) Reloads of Reloads ...............................109
 (b) October 1, 2002—December 12, 2003 period......................110

V. Tranche I (Pre–August 21, 2001): Whether Fuji Established Benun's Willful and Malicious Injury to Its Property for Purposes of § 523(a)(6) Exception to Discharge ..........................................................110

VI. Issues of Enhancement of Compensatory Damages..........................111
 A. Lack of Clarity in the Patent Law ....................................112
 B. Facts Establishing Infringement ......................................112
 C. Facts Establishing Damages ..........................................113
 D. Effect of Judgments, Penalty and Bankruptcy on Damage Enhancement and Fees ......................................114
 E. Case, Taken as a Whole, Does Not Warrant Enhanced Damages............114
 F. "Bad Faith" Finding of ITC II Compared and Contrasted .................115

VII. Interest on Claims; Attorneys' Fees and Costs .............................116

VIII. Summary/Conclusion..............................................118

## I. *Background.*

Fuji Photo Film Co., Ltd ("Fuji") sues Chapter 7 debtor Jack C. Benun ("Benun") to except from his bankruptcy discharge certain debt and claims arising from both established patent infringement and alleged continued infringement by Jazz Photo Corp. ("Jazz") and Benun. In immediate dispute are complex questions of Benun's purported "willful and malicious injury" to Fuji's property rights in patents for disposable cameras. *See* 11 U.S.C. § 523(a)(6) (exception to discharge based upon such willful and malicious injury). This adversary proceeding was tried for twenty-three days over a period of more than nine months, and the court reaches the findings of fact and conclusions of law set forth hereinafter.

The Fuji–Jazz–Benun dispute has a decade-long history, during which Fuji pursued Benun and Jazz for patent infringement.[1] Jazz, in liquidation following

---

1. Related decisions include: *Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n*, 474 F.3d 1281 (Fed.Cir.2007) (hereinafter *"Appeal III"*), *affirming in part and reversing in part In the Matter of Certain Lens–Fitted Film Packages, Inv. No. 337–TA–406 Enforcement Proceeding II* (Int'l Trade Comm'n January 14, 2005) (hereinafter "ITC II"); *Fuji Photo Film Co., Ltd. v. Benun*, 463 F.3d 1252 (Fed.Cir.2006), *affirming* unreported decision of District Court preliminarily enjoining Benun and others from importing certain cameras (hereinafter *"Ribi Tech Case"*); *Jazz Photo Corp. v. United States*, 439 F.3d 1344, (Fed.Cir.2006)

(hereinafter *"CIT Appeal"*), *affirming* 353 F.Supp.2d 1327 (Ct. Int'l Trade 2004) (hereinafter *"CIT Trial"*); *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368 (Fed.Cir. 2005) (hereinafter *"Appeal II"*), *affirming* 249 F.Supp.2d 434 (D.N.J.2003) (hereinafter *"District Court I"*) (and *see* the related opinion on motions at 173 F.Supp.2d 268 (D.N.J.2001)); *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed.Cir.2001) (hereinafter *"Appeal I"*), *reversing in part In the Matter of Certain Lens–Fitted Film Packages, Inv. No. 337–TA–406* (Int'l Trade Comm'n June 28, 1999)

confirmation of a Chapter 11 liquidating plan, had been a corporation whose stock was owned by Benun's family but which operated under his control. The Fuji–Jazz–Benun litigation trail, in summary form for present purposes, began with a Fuji-prompted investigation by the International Trade Commission ("ITC I"). On June 28, 1999 the ITC adopted an administrative finding that the importing and sale of certain "Lens–Fitted Film Packages" (disposable cameras referred to as "LFFPs") by Jazz and a number of other importers violated Fuji's patents. The Commission issued a General Exclusion Order and Order to Cease further infringement of Fuji's patents (hereinafter the "Cease and Desist Order"). Jazz (not Benun) and others appealed to the Federal Circuit ("*Appeal I*"). In significant part, the appeal centered on what manner of refurbishment of Fuji-patented disposable camera shells would be an allowable "repair," as distinguished from an infringing "reconstruction." Meanwhile, immediately on the heels of the 1999 ITC I decision, Fuji sued Jazz, its Hong Kong subsidiary *and Benun* in an infringement/damage action in the United States District Court for the District of New Jersey ("*District Court I*"). The chronology of these three matters is:

- ITC initial investigation (ITC I)—March 18, 1998 to June 28, 1999;
- Fuji District Court patent suit (*District Court I*)—June 23, 1999 to March 18, 2003 (judgment date); and
- Appeal of ITC I to Federal Circuit (*Appeal I*)—September 28, 1999 to August 21, 2001 (decision date).

*Appeal I* resulted in a reversal of the ITC on the basic *concept* of allowing re-

pair. While disposable camera shells could be repaired, the affirmative defense of such repair had yet to be established by the appellants (including Jazz). The Federal Circuit's lengthy opinion included only the most generalized description of "how to" refurbish LFFPs so that the affirmative defense of "repair" could be advanced by Jazz and others (leaving future process issues for eventual case-by-case resolution). The Federal Circuit reversal applied "to LFFPs for which the patent right was exhausted by first sale in the United States, and that were permissibly repaired." *Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d at 1110. The "first sale *in the United States*" (emphasis added) requirement has taken on overriding significance. There was a remand to the ITC for implementation of the decision, which, in turn, generated a request for comment by the ITC. Fuji's comment included a request for an enforcement proceeding (as to the earlier Commission Cease and Desist Order), targeting not only Jazz, *but also Benun* and Jazz's then president (Cossentino). On September 24, 2002 the ITC acceded to Fuji's request by initiating an enforcement proceeding against Jazz, Benun and Cossentino ("ITC II").

*District Court I,* long stayed pending the Federal Circuit's decision in *Appeal I,* resulted in a near $30 million judgment against Jazz, its Hong Kong subsidiary and Benun, jointly and severally. The judgment of March 18, 2003 (covering infringement only through the date of the decision in *Appeal I,* August 21, 2001) propelled Jazz and Benun into this court. Jazz filed a Chapter 11 petition on May 20, 2003, and Benun filed a like petition on July 2, 2003.[2]

---

(hereinafter "ITC I"); *In re Benun,* 339 B.R. 115 (Bankr.D.N.J.2006); and *In re Jazz Photo Corp.,* 312 B.R. 524 (Bankr.D.N.J.2004).

2. Eventually, Jazz was rendered subject to liquidation (an ongoing post-confirmation process) and Benun's individual Chapter 11 case was converted. Jazz's liquidation plan

*District Court I* included a jury finding that Jazz and Benun had proven the affirmative defense of repair for only a small portion of the more than forty million refurbished LFFPs Jazz had sold between 1995 and August 21, 2001. Something less than four million refurbished LFFPs were proven repaired in an approved *process,* and only 9.5% of the total sales of refurbished LFFPs were established as the product of patent exhaustion via the necessary first sale by Fuji or a Fuji licensee *in the United States.*[3] The infringing sale of reconstructed cameras, however, was found to be "not willful" on Jazz's part; moreover, while Benun was found to have *induced* this infringement, that inducement was determined by the jury to be "not willful." The jury also determined that Jazz had *willfully infringed,* and Benun had, correspondingly, *willfully induced* that infringement, for some 1,209,-760 newly made (*not* refurbished) LFFPs.[4] Notwithstanding this jury finding as to willfulness, the Court declined to award enhanced damages and attorneys' fees "under the circumstances of this case." 249 F.Supp.2d at 457 n. 30.

*Appeal II* from *District Court I* specifically addressed (among other points of appeal and cross-appeal) the Jazz/Benun challenge to the willfulness determination as to the newly made LFFPs and Fuji's challenge to the refusal to enhance damages (argued on appeal by Fuji as to *refurbished* LFFPs); on January 14, 2005 *District Court I* was affirmed on all points of appeal.

Meanwhile, ITC II had been initially interrupted by the bankruptcies.[5] Eventually, this court issued an order removing any perceived bankruptcy obstacle to the continuation of the ITC II enforcement proceeding. Things went badly there for Jazz and Benun. On July 27, 2004 the ITC adopted administrative findings that Jazz, with Benun's complicity, had again infringed Fuji's patents (now, after August 21, 2001). On the day of the Federal Circuit's January 14, 2005 affirmance of the District Court in *Appeal II,* the ITC levied a $13,675,000 penalty (for violation of the 1999 Cease and Desist Order for the August 21, 2001 through December 12, 2003 period), jointly and severally, against Jazz and Benun. The penalty is due the United States government; however, Fuji has filed claims in the Jazz and Benun bankruptcies based upon the ITC findings. The ITC II penalty was appealed, again to the Federal Circuit ("*Appeal III*"). That appeal, on *Benun's behalf* (only), after Jazz's withdrawal, generally affirmed ITC II. Yet there was a reversal of a portion of the ITC's finding, the appeal *approving* the remolding of certain "spent parts" in the allowable process of repair. *See Appeal III,* 474 F.3d at 1295–98. (On remand to the ITC, the penalty was reduced based upon the spent-part reversal, to $13,138,000.)

In a related branch of the Fuji–Jazz–Benun disputes, certain containers of LFFPs were denied entry into the United States by United States Customs in August 2004. Customs acted pursuant to the

was confirmed by Order of May 13, 2005, and Benun's case was converted to one in Chapter 7 on March 11, 2005.

3. The District Court then defined the intersection of these two requirements as the limit of the proven affirmative defense (i.e., 380,944 units), leaving 39,718,425 as infringing sales.

4. No affirmative defense of "repair" could have been asserted where LFFPs were produced from newly molded camera shells and parts.

5. Whether ITC II was actually "stayed" per 11 U.S.C. § 362(a), or was not so stayed per § 362(b)(4), was never resolved.

ITC's Cease and Desist Order. Jazz challenged Customs by application of October 4, 2004 to the Court of International Trade (the "CIT"). That Court tried the dispute (between the United States government and Jazz, to the exclusion of would-be intervenor Fuji), in November 2004. Some (but not all) LFFPs were deemed to have been established as compliant with the affirmative defense of first sale/repair, and were thus released into the United States.[6] The United States government appealed; on February 28, 2006, the Federal Circuit affirmed the decision of the CIT.

## II. *Pretrial Motions.*

As would be expected, the parties engaged in substantial pretrial motion practice. Fuji sought discovery access to

Jazz–Benun's counsel in *District Court I*/ITC II; that access was denied. *Fuji Photo Film Co., Ltd. v. Benun,* 339 B.R. 115 (Bankr.D.N.J.2006). The parties cross-moved for summary judgment, pressing (among other arguments) each side's perception of the preclusive effects of *District Court I* and/or ITC II. Summary judgment as to willful and malicious injury to Fuji's patent rights was denied to both sides,[7] while the court solicited more structured and precise input from the parties as to standards for Benun's state of mind, application of those standards in time frames before and after August 21, 2001, and preclusion. *See* December 16, 2005 transcript (docket entry 35) at 55:23–58:13. Ultimately, these issues were readdressed on the eve of trial.

6. Characteristic of the intense marketplace struggle between Benun and Fuji, these LFFPs were purchased from the liquidating debtor, Jazz, through this court by a newly formed entity, "Ribi Tech"; Ribi Tech is said to be owned by Benun's wife and operated by him; Fuji has sued Ribi Tech *and* Benun in the United States District Court for New Jersey (the ongoing *"Ribi Tech Case"*).

7. After oral argument on December 16, 2005, this court granted Benun's motion for summary judgment on Complaint Count Two, thereby eliminating from this adversary proceeding 11 U.S.C. § 523(a)(4) (exception to discharge for breach of a fiduciary duty). *Inter alia,* it was concluded that Benun was not a "fiduciary" as that term is used in § 523(a)(4), Fuji was not a beneficiary of any entrusting relationship, and that Fuji's effort to expand this discharge exception would render superfluous much of the application of § 523(a)(6), contrary to the intent of Congress. *See In re Casini,* 307 B.R. 800, 818 (Bankr.D.N.J.2004). In fact, though in control of *Jazz,* Benun was not, in critical periods, a shareholder, director or officer of the corporation, nor did Jazz approach a "zone of insolvency" (for analysis under such cases as *In re Carretta,* 219 B.R. 66 (Bankr.D.N.J. 1998)) until *District Court I* was decided. *See* December 16, 2005 transcript (docket entry 35) at 54 and 55. *See also In re Kaczynski,*

188 B.R. 770, 773–74 (Bankr.D.N.J.1995) ("fiduciary" is interpreted narrowly under bankruptcy law in order to promote the fresh start policy of the Code; the customary definition, meaning "a relationship of confidence, trust and good faith, is too broad" for this purpose, therefore § 523(a)(4) "is limited to instances involving express or technical trusts"; furthermore, the obligations of the trustee "must be independent of any contractual obligation between the parties and must be imposed prior to, rather than by virtue of, any claim of misappropriation," so that "implied or constructive trusts and trusts ex maleficio" do not confer fiduciary status under the Code) (internal references omitted). *Compare and contrast In re Docteroff,* 133 F.3d 210 (3d Cir.1997) (where, unlike Benun, the debtor was an officer and director of a holding company of the defaulting company, a specific fund was deposited with the defaulting company by the injured creditor, and both the Bankruptcy Court and the District Court below had concluded "that ... Docteroff obtained [the funds] while he owed a fiduciary duty to [the depositor] and by *embezzling* funds from [the defaulting company])." 133 F.3d at 217–18 (emphasis added).

*Sub judice,* there has been no such deposit by Fuji, no such shareholder/director/officer relationship of Benun, and, most clearly, no "embezzlement" alleged by Fuji.

Direct experience with the Fuji–Jazz–Benun disputes, and exposure to the disputes in other forums, served to alert this court to trial management obstacles. The overgeneralized summary judgment motions, each selectively relying on litigation history, drove home the need to rein in the scope of the trial. Hence, this court ordered that direct testimony be fully presented in written form and prior to trial. Declarations or affidavits were required (with proffers allowed for adverse or unavailable witnesses). Notwithstanding the written submissions, unless otherwise agreed by the parties, witnesses would have to be available at trial for cross-examination. Rebuttal testimony was not covered by the written submission requirement. *See* January 30, 2006 transcript (docket entry 57) at 10:10–12:22; February 6, 2006 transcript (docket entry 63) at 28:1–23.

Trial exhibits were to be premarked and submitted pretrial; stipulations as to exhibits and facts were to be the subject of counsels' conferences in the days leading up to trial. Unfortunately, while exhibits generally were duly marked and submitted, essentially no stipulations were developed as to exhibits or facts (either because time ran out, or entrenched positions reflecting the bitterness of long-fought matters prevailed, or a combination of these causes).

The prospect of a long trial (where no quarter would be given by either side) became clear. Last minute maneuvering by the parties included (among other efforts): Fuji's abandonment of some of its substantive claims;[8] Fuji's limitation of its infringement damage claim to the outside date of December 12, 2003;[9] Fuji's motion to limit (and foreclose) court consideration of the CIT Case and its Federal Circuit affirmance (based upon the December 12, 2003 damage cutoff, since the CIT Case dealt with LFFP shipments in August 2004); Benun's motion to limit (i.e., foreclose) Fuji's reliance on the testimony of a proposed witness, Bilka;[10] and, an extension of the continuum of motions (starting with the unmatured summary judgment motions and running through trial threshold motion practice) seeking to limit the scope of trial based upon various concepts of preclusion.

Fuji's self-imposed limitations were not objected to; its effort to have this court disregard the CIT Case were generally unsuccessful;[11] and, the Bilka testimony

---

8. By Consent Order entered on May 24, 2006 Fuji voluntarily dismissed with prejudice Count One of its Amended Complaint. Count One sought to deny Benun a discharge under 11 U.S.C. § 727.

9. This is the date established as the cutoff for the ITC II penalty assessment (the period of claimed violation being the August 21, 2001 date of the Federal Circuit decision in *Appeal I* through the hearing date of ITC II).

10. Bilka, a witness in ITC II, was a paralegal retained by Fuji's counsel to "catalog" the origins and characteristics of some 2,800 cameras and LFFP shells which Fuji personnel had previously investigated. Bilka's accounting was based solely and exclusively upon camera characteristics and data provided to him by others (through Fuji's counsel).

11. This Court is reluctant to disregard opinions of the Court of International Trade *[Jazz Photo Corp. v. United States,* 353 F.Supp.2d 1327 (Ct. Int'l Trade 2004)] and certainly the Federal Circuit *[Jazz Photo Corp. v. United States,* 439 F.3d 1344 (Fed.Cir.2006)]. This Court will, as indicated in my Order of 7/18/06, ... consider the CIT opinion and the Federal Circuit opinion affirming it, but with the understanding that the post ... 12/12/03 initiated efforts by Jazz and Benun at compliance with permissible repair requirements will not be probative as to pre 12/12/03 compliance or alleged compliance. And similarly as to the debtor's state of mind, the Court will not deem ... those opinions to be probative unless proofs proximately link post 12/12/03 events to pre 12/12/03 state of mind. And I'll

was not excluded, though the basis and foundation for his cataloging were issues deferred to trial.[12] Scope of trial issues was rebriefed and argued both shortly before trial and on the first day of trial, and decided at those hearings.[13]

### III. *Scope of Trial.*

*District Court I* provides a clear line of demarcation for matters remaining in dispute *sub judice*. Debts of Jazz/Benun (for established "injury" to Fuji) are unambiguously defined as those damages liquidated by the now-affirmed judgment. Thus, Benun's debt (hereinafter "Tranche I Damages") due Fuji for inducing infringe-

ment is established for the 1995 through August 21, 2001 period.

Fuji *claims*[14] against Benun arising in the post-August 21, 2001 period run through the December 12, 2003 cutoff date (hereinafter "Tranche II Alleged Damages"). Though ITC II, through the Administrative Law Judge's opinion of April 6, 2004 (covering approximately 150 pages), is the basis for a *penalty assessment*, neither the ITC nor any court has reduced *Fuji's claim* in Tranche II to judgment in Fuji's favor and against Benun. In fact, through this adversary proceeding, Fuji has of necessity sought to reduce its claims to liquidated debt status for Tranche II,[15] *and* seeks a determina-

hear, if as and when necessary, proofs and objections when the time comes.
July 26, 2006 transcript (docket entry 164) at 23:13–25.

12. *See* July 17, 2006 transcript (docket entry 155) at 11:17–12:2; 27:23–28:14; and 30:3–8.

13. Though cross-summary judgment motions had been denied (and that denial reiterated) in the December 16, 2005 through February 2006 period, by May 26, 2006 (*see* transcript, docket entry 116) the preclusion issues by tranche of damages were pinpointed, and briefing was required by the court. At a hearing on motions *in limine* on July 17, 2006, the court, reflecting on the parties' pretrial memoranda as to issue preclusion, decided that *inter alia* ITC II would not be preclusive (docket entry 155 at 52:7–19). That issue had been fully briefed and argued by the parties. In addition, the court expressed its *inclination* to excise from trial Fuji's claims arising from refurbishment of LFFPs to the extent of the "nonwillful" *District Court I* jury determination. The parties (and Fuji in particular) were put on notice of the court's intention to decide that scope of trial issue on July 26, 2006 (the first day of trial); supplemental briefs were solicited (docket entry 155 at 54:24–55:2). The issue was decided on July 26, 2006, as hereinafter described (docket entry 164 at 10:9–22:25).

14. Under the Bankruptcy Code "the term 'debt' means liability on a claim." Claim includes "right to payment, *whether or not*

such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(12) and (5A), respectively (emphasis added). In fact, Fuji has filed three separate proofs of claim in Benun's bankruptcy case (Nos. 5, 23, and 24 in that case), and Benun has objected to each (*see* case docket entry 312, dated April 5, 2006).

15. Hence, *judgment* for Tranche II damages becomes a potential matter ancillary to the determination of exception to discharge; indeed, given the nature of the patent infringement claim and the affirmative defense, short of deeming ITC II to be preclusive and/or determining that all Tranche II damages were other than willful and malicious injury to Fuji, this court cannot determine what (if any) part of the Tranche II claims are excepted from discharge without deciding the merits and extent of the affirmative defense. Fuji has submitted to the jurisdiction of this court by both *filing* proofs of claim and *initiating* this adversary proceeding. As to the authority of bankruptcy courts to both determine liability and liquidate claims in the course of deciding exception to discharge adversary proceedings, *see De La Cruz v. Cohen (In re Cohen)*, 185 B.R. 171 (Bankr.D.N.J.1994); *De La Cruz v. Cohen (In re Cohen)*, 185 B.R. 180, 188–89 (Bankr.D.N.J.1995); *aff'd*, 191 B.R. 599 (D.N.J.1996); *aff'd*, 106 F.3d 52 (3d Cir. 1997); *cert. granted*, 521 U.S. 1152, 118 S.Ct. 30, 138 L.Ed.2d 1060 (1997); *aff'd* 523 U.S.

tion of exception to discharge for *both tranches of damages.* Benun has challenged Fuji's Tranche II claims and all allegations of exception to discharge.

The scope of this trial has thus been impacted by issue preclusion and/or the persuasive or advisory effect of *District Court I* and *ITC II*—each having fully addressed questions of infringement (*District Court I* as to Tranche I and *ITC II* as to Tranche II).

### A. Tranche I (1995 through August 21, 2001).

#### 1. District Court I Judgment.

ITC I, prompted by Fuji, named twenty-seven respondents including Jazz. The list of "unlawful activities" contained in the operative statute, § 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 (" § 337") includes "[t]he importation into the United States [and] ... sale ... after importation ... of articles that ... infringe a valid and enforceable United States patent...." 19 U.S.C. § 1337. Fuji alleged that the twenty-seven respondents had infringed fifteen patents owned by Fuji relating to LFFPs. The Administrative Law Judge ("ALJ"), in his initial determination, found that twenty-six of the twenty-seven respondents, including Jazz, had violated § 337 by infringing Fuji's patents. The ALJ recommended cease and desist orders against each of the domestic respondents and a general exclusion order against importing infringing LFFPs. The ITC adopted the recommendations of the

ALJ, as well as the ALJ's pertinent findings with respect to infringement in ITC I.

The ALJ had reasoned that the common activities of some of the respondents in refurbishing [16] the spent shells amounted to "effectively recreating the patented single use camera of [Fuji] and its licensees, and hence [was] impermissible reconstruction." ITC I at 5. For the other respondents, the ALJ found that there was "insufficient information in the record about the processes employed by their suppliers [of LFFPs] ... [and thus] those respondents failed to carry their burden of proof...." *Id.* Thus, the *affirmative defense* of "repair" was denied twenty-six respondents and the Cease and Desist Order issued.

In Jazz's appeal to the Federal Circuit, a stay of the ITC Cease and Desist Order was granted pending decision on the appeal. This was said to have been the first Federal Circuit stay of an ITC exclusion order pending appeal. Cases and Recent Developments, *Patentee Exhausted Patent Rights By First Sale Of Cameras Sold In The U.S. For Single Use; Single Use Label Did Not Create Sufficient Restriction On Sale To Bring Sale Out Of Ambit Of Exhaustion,* 11 FED. CIR. B.J. 457, 525 (2001–02).

The ALJ, in his initial determination, had summarized the following common steps employed by the respondents to refurbish the spent shells, and had found the process to be "impermissible reconstruction":

213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *see also Shaw v. Santos (In re Santos),* 304 B.R. 639, 646–47 (Bankr.D.N.J.2004). This matter is thus "core" pursuant to 28 U.S.C. § 157(b)(2)(B) and (I). (As a collateral matter, besides those claim allowance and exception-to-discharge proceedings "arising under title 11," a certain amount of the alleged inducement to infringe occurred *postpetition,*

and to that extent is "arising in" a case under title 11. 28 U.S.C. §§ 1334(b); 157(b)(2)(A) and (B).)

**16.** In *Appeal I* the Federal Circuit used the word "refurbish" as "a convenient neutral term without legal significance, intended to connote neither 'repair' nor 'reconstruction' of the used cameras." 264 F.3d at 1098 n. 1.

- removing the cardboard cover;
- opening the LFFP body (usually by cutting at least one weld);
- replacing the winding wheel or modifying the film cartridge to be inserted;
- resetting the film counter;
- replacing the battery in flash LFFPs;
- winding new film out of a canister onto a spool or into a roll;
- resealing the LFFP body using tape and/or glue;
- applying new cardboard cover.

264 F.3d at 1101. In reversing this "impermissible reconstruction" finding, the Federal Circuit explained:

> The Commission adopted the ALJ's findings and conclusions that the remanufacturers were not simply repairing an article for which either the producer or the purchaser expected a longer useful life, pointing out that the purchaser discarded the camera after use. The Commission ruled that the respondents were not simply repairing the LFFP in order to achieve its intended life span, but created a new single use camera that would again be discarded by its purchaser after use.
>
> ... [The] Supreme Court decisions which underlie precedent require that infringing reconstruction be a "second creation" of the patented article. Although the Commission deemed this requirement met by the "remanufactured" LFFPs, precedent places the acts of inserting new film and film container, resetting the film counter, and resealing the broken case—the principal steps performed by the remanufacturers—as more akin to repair.

*Id.* at 1105–06.

However, the Federal Circuit's reversal of the Commission's determination on the common eight steps did not fully vindicate the activities of all respondents. Indeed,

the Federal Circuit affirmed the ITC's finding of infringement with respect to all respondents (including Jazz) who had failed to provide sufficient evidence of their repair processes to show permissible repair. And, permissible repair, as an affirmative defense, had to be established by *both* the processing steps *and exhaustion of patent rights by lawful first sale in the United States.* *Id.* at 1105. The "first United States sale" requirement had not been raised before the ITC, and appears to have surprised the parties-in-interest. *See* Final Jury Instructions (hereinafter "Jury Instructions") in *District Court I*, Docket Entry 143–2, Ex. A at No. 27(A) ("During ... this lawsuit, the court which supervises patent law cases has clarified the law in a way that none of the parties expected.... A little over a year ago, the supervising court announced the rule about shells first sold in the U.S.... [N]o one knew before that time the source of shells would be important ...."); *see also District Court I*, 249 F.Supp.2d at 450; Daniel J. Gifford, *How Do the Social Benefits and Costs of the Patent System Stack Up in Pharmaceuticals?*, 12 J. INTELL. PROP. L. 75, 120–21 (2004) ("In the past, U.S. courts tended to apply exhaustion to unrestricted sales abroad by a U.S. patentee or a party in privity with a U.S. patentee. Recently, however, the Federal Circuit [*Appeal I*] has ruled that for exhaustion to apply, 'the authorized first sale must have occurred under the United States patent,' a view that appears to embrace a domestic, rather than international, view of exhaustion.").

ITC I faded away, but for the persistence of the Cease and Desist Order of 1999 (and other ancillary matters, including a Jazz bond forfeiture issue). *See* Ex. P–118A at p. 4 n. 4.

It is with the background of ITC I and *Appeal I* that, in *District Court I*, the jury reached the following verdict:

- Jazz infringed Fuji's patents with respect to 39,889,850 of the 40,099,369 refurbished cameras sold by Jazz from 1995 through August 21, 2001;

- Jazz infringed Fuji's patents with respect to 1,209,760 newly made cameras sold during this period;

- Mr. Benun induced Jazz Photo's infringement with respect to 39,103,664 cameras;

- Defendants' sale of newly-made cameras was willful, but their sale of refurbished cameras was not willful;

- A reasonable royalty for Jazz's alleged infringement is 56 cents per infringing camera sold; and

- Fuji lost profits of $3,531,711.70 as a result of Jazz's sales of refurbished cameras and $112,749.63 as a result of Jazz's sales of newly-made cameras.

249 F.Supp.2d at 441.

Pursuant to the parties' stipulations, the District Court:

(1) determine[d] whether the factual refurbishment processes found by the jury constituted legally permissible repair or legally impermissible reconstruction; and (2) determine[d] the number of legally infringing cameras and appl[ied] that number mathematically to the jury's damages verdict in order to determine the total amount of damages to be awarded.

*Id.* at 441. Judgment was entered against Benun in the total amount of $22,919,783.60 (56¢ per infringing camera, including both refurbished and the newly made Sesame Street™ cameras) plus prejudgment interest (of almost $7 million). *Id.* at 459. Benun's Tranche I "injury" to Fuji property is thus established; however, the "willful" and "malicious" aspects of the § 523(a)(6) exception to discharge must be admeasured against issue preclusion and related concepts.

2. *Issue Preclusion.*

Issue preclusion (or, collateral estoppel) "prevents relitigation of a particular fact or legal issue that was litigated in an earlier action." *Seborowski v. Pittsburgh Press Co.,* 188 F.3d 163, 169 (3d Cir.1999) (*citing Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)). It has "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery,* 439 U.S. at 326, 99 S.Ct. 645. The Supreme Court has held that the principles of collateral estoppel apply to nondischargeability proceedings in bankruptcy. *Grogan v. Garner,* 498 U.S. 279, 284–85 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Because the infringement determination of *District Court I* was rendered by a federal court, this court must apply federal principles of collateral estoppel. *In re Docteroff,* 133 F.3d 210, 214 (3d Cir.1997).

For a party to be estopped from relitigating an issue, the following elements must be present: (1) the issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.

*Id.* (*citing In re Ross,* 602 F.2d 604, 608 (3d Cir.1979); *accord* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)).

Did the willful infringement/nonwillful infringement jury findings of *District Court I* involve the same issues now being presented to this court under

§ 523(a)(6)? [17] As will be more fully discussed, the concept of willful patent infringement is broader than the "willful ... injury" of the Bankruptcy Code. Among the differences in concept, patent law includes reckless as well as intentional acts in the ambit of "willful infringement"; bankruptcy law limits § 523(a)(6) willful injury to intentional *injury* (an apparently more curtailed concept than intentional *acts* ). As applied in this case, logic would justify preclusion to the extent of the "same issue" determination as to refurbished cameras (but not those newly molded).

More specifically, to the extent that Benun was found by the jury to have committed *no willful* inducement to infringe in reloading used camera shells, it was decided that he acted neither intentionally, thus of necessity not injuring Fuji intentionally (the bankruptcy focus), nor recklessly; this finding would therefore meet the "same issue" general requisite of RESTATEMENT (SECOND) OF JUDGMENTS § 27. The finding of *willful* infringement with respect to the newly molded 1,209,760 unit "Sesame Street™" order differs; that jury determination could well have been based upon a broader willfulness conception in patent law—which includes recklessness—rather than the more circumscribed bankruptcy law's "willfulness." As to the evolving standards for "willful" infringement, *see In re Seagate Technology, LLC,* 497 F.3d 1360 (Fed.Cir.2007). Moreover, the "malicious" aspect of § 523(a)(6) was never before the jury.

■] Notwithstanding the apparent satisfaction of general issue preclusion rules by at least the nonwillful infringement finding (for refurbished LFFPs), issue preclusion "is subject to a number of equitable exceptions designed to assure that the doctrine is applied in a manner that will serve the twin goals of fairness and efficient use of private and public litigation resources." *National R.R. Passenger Corp. (AMTRAK) v. Pa. P.U.C.,* 288 F.3d 519, 525 (3d Cir.2002) (referring to RESTATEMENT (SECOND) OF JUDGMENTS § 27). Notably, the Restatement provides that an issue, otherwise meeting the requirements for preclusion, is not precluded when "[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action...." *Id.* at 525 n. 3 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 28(4)).

■] The *District Court I* jury finding of *no willfulness* with respect to patent infringement for refurbishing LFFPs was based on a "clear and convincing" burden of persuasion. *See* Jury Instructions at No. 50. That same high standard was applied in the *willful* infringement finding as to the newly molded LFFPs. *Id.* Section 523 exceptions to bankruptcy discharge need only be proven by the less weighty preponderance standard. *Grogan,* 498 U.S. at 291, 111 S.Ct. 654. Application of the burden differential exception to this case would have the *nonwillful* finding as to refurbished cameras not preclusive (because the lesser bankruptcy burden could theoretically have been satisfied); conversely, the heavy burden met in *District Court I* as to *willful* infringement for the newly molded LFFPs would support preclusion (though here the "same

---

17. Other basic requirements for issue preclusion have been met, i.e., the intent issue (to the extent decided) was "actually litigated"; there has been a valid and final judgment issued in *District Court I;* and, the findings as to willfulness were essential to the District Court's determination.

issue" deficit cannot be overcome because "recklessness" may have been at the heart of the jury decision).

While there is some precedent for overriding the burden differential issue preclusion exception of RESTATEMENT (SECOND) OF JUDGMENTS § 28(4),[18] as will be set forth below, collateral estoppel need not be applied *sub judice* in order to establish Benun's right to a discharge of the nonwillful infringement aspect of the *District Court I* judgment. Rather, as to the largest part Tranche I damages (arising from nonwillful infringement for impermissibly reconstructing LFFPs, i.e., failing to establish the affirmative defense of repair), the jury finding *in conjunction with various other factors* has persuaded this court that the § 523(a)(6) exception to discharge cannot be proven by Fuji.[19]

### 3. *Factors Deemed Persuasive In Limiting the Scope of Trial.*

### (a) *"Willful" As Defined in Bankruptcy and Patent Law.*

 "[B]ecause of bankruptcy's underlying concern for affording a new be-ginning, statutory exceptions to discharge are generally construed 'narrowly against the creditor and in favor of the debtor.'" *Boston Univ. v. Mehta (In re Mehta)*, 310 F.3d 308, 311 (3d Cir.2002) (*quoting In re Pelkowski*, 990 F.2d 737, 744 (3d Cir. 1993)). The burden of proof in the general exception-to-discharge adversary proceeding thus falls on the creditor.[20]

Section 523(a)(6) provides that a discharge does not relieve an individual of a debt "for willful and malicious injury by the debtor ... to the property of another entity." The Supreme Court addressed the "willful" requirement as follows:

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an addi-

---

**18.** RESTATEMENT (SECOND) OF JUDGMENTS, § 28, cmt. f leaves open the possibility of an exception to the exception regarding burdens of proof.

> To apply issue preclusion in the cases described in Subsection (4) [differences in the burden of persuasion] would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden been imposed. *While there may be many occasions when such a holding would be correct,* there are many others in which the allocation and weight of the burden of persuasion (or burden of proof, as it is called in many jurisdictions) are critical in determining who should prevail. Since the process by which the issue was adjudicated cannot be reconstructed on the basis of a new and different burden, preclusive effect is properly denied.... [Emphasis added.]

*See Marlene Industries Corp. v. NLRB,* 712 F.2d 1011 (6th Cir.1983); *Lane v. Sullivan,* 900 F.2d 1247 (8th Cir.1990); *see also In re Church,* 69 B.R. 425 (Bankr.N.D.Tex.1987); *In re McDonald,* 73 B.R. 877 (Bankr.N.D.Tex. 1987); *In re Nix,* 92 B.R. 164 (Bankr.N.D.Tex. 1988); *In re Powell,* 95 B.R. 236 (Bankr. S.D.Fla.1989), *aff'd,* 108 B.R. 343 (S.D.Fla. 1989), *aff'd,* 914 F.2d 268 (11th Cir.1990).

**19.** The jury finding as to *willful* infringement (for the newly produced cameras), already deemed to be nonpreclusive, will also be assessed in terms of its persuasive effect in conjunction with other factors.

**20.** In the case at bar, for Tranche II *both* the debtor's state of mind ("willful and malicious") and the injury (patent infringement) are at issue; there are thus crosscurrents as to ultimate burdens of persuasion. Fuji has that burden as to Benun's § 523(a)(6) state of mind, while it is Benun's burden to establish the affirmative defense to infringement, i.e., repair.

tional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, comment a, p. 15 (1964) (emphasis added). *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Specifically, *Geiger* held that a prepetition judgment of medical malpractice against a debtor, based on "negligent or reckless" conduct, would *not* satisfy the requirements of § 523(a)(6). *Id.* at 60, 118 S.Ct. 974.

Since *Geiger*, Circuits have split over the extent to which the Supreme Court defined "willful." The uncertainty on this issue stems from *Geiger's* citation to the RESTATEMENT (SECOND) OF TORTS § 8A. In language not cited by the Supreme Court, but included in the same section, the Restatement encompasses in its definition of "intent" not only the situation in which the actor "desires" the consequences, but, in an alternative *second prong*, where the actor "believes that the consequences are substantially certain to result from [his act]." RESTATEMENT (SECOND) OF TORTS § 8A.

The Sixth Circuit found the Court's analysis in *Geiger* to favor adoption of the unquoted Restatement language. *In re Markowitz*, 190 F.3d 455, 464 (6th Cir. 1999). The *Markowitz* Court noted that the Eighth Circuit opinion which *Geiger* affirmed defined "willful" to include the

"substantially certain" language from the Restatement. *Id. (citing In re Geiger*, 113 F.3d 848, 857 (8th Cir.1997)).[21] In *Markowitz*, the Sixth Circuit found that a debt resulting from legal malpractice would not be excepted from bankruptcy discharge. 190 F.3d at 466. "[T]he mere fact that Markowitz should have known his decisions and actions put [his client] at risk is ... insufficient to establish a 'willful and malicious injury.' He must will or desire harm, or believe injury is substantially certain to occur as a result of his behavior." *Id.* at 465 n. 10. Other Circuits have agreed with or used similar reasoning to that of *Markowitz* and have adopted the two-pronged *subjective* test for willfulness. *See, e.g., In re Su*, 290 F.3d 1140 (9th Cir.2002); *In re Englehart*, 229 F.3d 1163 (10th Cir.2000) (unpublished) (also noting at 2000 WL 1275614 at *2 that *Geiger's* characterization of "unintended" injury as "neither *desired* nor *in fact anticipated by the debtor*" mapped closely to the Restatement language).

The Fifth Circuit, while adopting the two-pronged test for willfulness, has held that the "substantially certain" prong is an *objective* test. *In re Miller*, 156 F.3d 598, 606 (5th Cir.1998). Such an objective test has been viewed as contrary to the mandate of *Geiger*, in that it disregards the actor's state of mind in favor of an objective standard similar to recklessness. *See In re Su*, 290 F.3d at 1145–46. In addition, the Fifth Circuit's test is contrary to the plain text of the Restatement, which requires that the "*actor* ... believes that the consequences are substantially certain to result" from his act. RESTATEMENT (SECOND) OF TORTS, § 8A (emphasis added).

**21.** The Eighth Circuit's *Geiger* opinion used a subjective test: "If ... he was an intentional tortfeasor as we have defined that term, *he would have to have believed* that Mrs. Ka-

waauhau was substantially certain to suffer harm as a result of his actions." 113 F.3d at 852 (emphasis added).

The Third Circuit has not formally addressed the issue of how to define willfulness since the decision in *Geiger*. Prior to *Geiger*, the Third Circuit defined the willfulness requirement with reference to the Restatement, including the "substantially certain" language, and excluded from "substantially certain" those acts which have only a "high probability" of harm. *In re Conte*, 33 F.3d 303, 307–08 (3d Cir.1994). Though *Conte* would support the adoption by this court of a two-pronged test for willfulness, it is unclear in *Conte* whether the Third Circuit intended a subjective or objective test for the "substantially certain" prong. Although the *Conte* Court quoted the Restatement, the test was often formulated without linking "substantially certain" to the mind of the actor. Lower court decisions within this Circuit have used the second alternative of the two-pronged test, but have found that the facts satisfied both subjective and objective standards, and therefore declined to choose one. *See In re Elwood*, 319 B.R. 371 (E.D.Pa.2005); *In re Conner*, 302 B.R. 509 (Bankr.W.D.Pa.2003); *In re Scott*, 294 B.R. 620 (Bankr.W.D.Pa.2003).[22]

■ Ultimately, taking the strongest cue from *Geiger*, this court would, if compelled, apply the subjective standard to both prongs of what should be the two-pronged willfulness definition for § 523(a)(6). *Contra, In re Pavlovskiy*, 2007 WL 2048965 (Bankr.D.N.J.) (reading *Conte* as allowing objective proof of substantial certainty to injury). However, notwithstanding the burden placed upon plaintiff by the subjective standard (and particularly as to the substantial certainty prong), the court need not "simply take the debtor's word for his state of mind." *In re Su*, 290 F.3d at 1146 n. 6. "[I]n addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury producing action. . . ." *Id.* The net effect of evaluating circumstantial evidence is that in many cases proofs might well be assessed in a way which would narrow the conceptual gap between pure subjectivity and objectivity. *Cf. Field v. Mans*, 516 U.S. 59, 72–76, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (reasonableness not irrelevant in gauging subjective state of mind). And, as will be demonstrated hereinafter, *this case would be decided the same regardless of this conceptual diferential.*

Notwithstanding some of the above-stated variation in the "willfulness" definition under the Bankruptcy Code, willfulness in the patent infringement context is clearly a *broader* concept. It includes *recklessness*,[23] and therefore runs counter to *Geig-*

22. The recent nonprecedential case of *In re Granoff*, 250 Fed.Appx. 494 (3d Cir.), while reiterating *Conte's* use of the full Restatement position, does not refine the analysis of the second prong (though it appears to consider the subjective); *see also In re Schlessinger*, 208 Fed.Appx. 131 (3d Cir.2006).

23. "Willfulness" in infringement is one of degree; infringement ranges " 'from unknowing, or accidental, to *deliberate, or reckless, disregard* of a patentee's legal rights.' " *Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1343 (Fed.Cir.2004) (*quoting Rite–Hite Corp. v. Kelley Co.*, 819 F.2d 1120, 1125–26 (Fed.Cir.

1987)) (emphasis added). "[T]he deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct, may provide grounds for a finding of willful infringement. . . ." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1583 (Fed.Cir.1996). Reckless disregard of a patentee's legal rights can be such "unethical or injurious commercial conduct" that provides grounds for a finding of willful infringement. *See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1381 (Fed.Cir.2005) (defendant "did not engage in the kind of egregious and reckless conduct that warrants a willfulness finding").

er.[24] The *District Court I* jury determined that Benun's conduct in the refurbishing of LFFPs was not, for *patent law purposes,* proven (by the clear and convincing standard) to have been willful (and was therefore not even proven reckless). Thus, even without considering other factors, this court was at trial outset most skeptical that either prong of the Restatement definition of willfulness could now be established by Fuji, such that the *willful injury* requirement of *Geiger* could be proven.

Before the Federal Circuit added definition to the repair defense for LFFPs, an entire marketplace was operating in the field. ITC I, initiated in 1998 (three years into the Jazz–Benun period of operation), cited *twenty-seven refurbishers.* The refurbishing of LFFPs was controversial—with the ITC finding it to be a patent violation on the basis of the inapplicability of the repair defense. This conclusion was *reversed* by the Federal Circuit (after questioning the ITC's restrictive position by issuing a rare *stay pending appeal* of the Cease and Desist Order). The law was thus unclear before August 21, 2001. (Indeed, as will be discussed *infra,* the law remains less than well defined.) Moreover, the first sale in the United States requirement announced by the Federal Circuit was acknowledged as being a complete surprise to the case participants.

Given this background, the prospect of this court finding subjective willfulness for exception-to-discharge purposes with regard to Tranche I (by a preponderance of the evidence rather than the clear and convincing standard applied by the jury in *District Court I)* in Benun's inducement[25] of Jazz to infringe through refurbishing LFFPs, was unlikely. *Distinguish* the garden-variety § 523(a)(6) cases where infringement was clear and indefensible. *See In re Trantham,* 304 B.R. 298 (6th Cir.BAP2004); *In re Wood,* 309 B.R. 745 (Bankr.W.D.Tenn.2004). Moreover, applying an objective standard, i.e., that any *reasonable person* would have known of the substantial certainty of infringement and thus injury to Fuji, would not increase the likelihood of Fuji proving its case.

### (b) *The Malice Requirement of § 523(a)(6).*

Post-*Geiger,* the "malicious injury" requirement of § 523(a)(6) has been described as follows: "A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or

---

**24.** *Geiger,* 523 U.S. at 64, 118 S.Ct. 974 ("debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)").

**25.** *See* Jury Instructions at No. 50 ("Where a potential infringer has actual notice of another's patent rights, *he has a duty of due care not to infringe.* In making the determination as to willfulness, you must consider all of the evidence and the totality of the circumstances. The totality of the circumstances comprises a number of factors, which include, but are not limited to whether the *defendants exercised due care to avoid infringing the patent ....")* (emphasis added). The jury's finding of Benun's *inducement* to infringe was coupled with a finding of *"no willfulness";* this coupling, without more, re-

buts Fuji's pretrial position that the inducement finding portended "willfulness" for § 523(a)(6) purposes. Moreover, it is clear from Judge Hochberg's determination (on the post-finding motion for JMOL) that she based her support for the jury finding of inducement on Benun's control of Jazz—without specifying any state of mind *to harm Fuji. See* 249 F.Supp.2d at 457–58; *see also* Jury Instructions at No. 24. *Consider Appeal II,* 394 F.3d at 1377, where the Federal Circuit set forth its admittedly unsettled standards for the appropriate level of *intent* to induce *(quoting Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469 (Fed.Cir.1990); and *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553 (Fed.Cir.1990)).

excuse.'" *In re Su*, 290 F.3d at 1146–47 (*quoting In re Jercich*, 238 F.3d 1202, 1209 (9th Cir.2001)). However, courts disagree over whether malice is actually distinct from willfulness and whether malice requires a subjective or objective test. *See, e.g., In re Sicroff*, 401 F.3d 1101, 1106 (9th Cir.2005) (*citing In re Su's* definition of malice and emphasizing that "it is the wrongful act that must be committed intentionally rather than the injury itself"— a subjective test only with regard to the act); *In re Bundick*, 303 B.R. 90, 109 (Bankr.E.D.Va.2003) (defining malice as a distinct test in which "the debtor's subjective mind set is central to the inquiry as to whether debtor acted deliberately in knowing disregard of a creditor's rights in property"); *In re Miller*, 156 F.3d at 603 (defining "willful and malicious injury" as a "unitary concept entailing a single two-pronged test" in which one prong is subjective and the other is objective); *In re Markowitz*, 190 F.3d at 465 n. 10 (holding that "the lack of an excuse or justification for his actions will not alone make [the debtor's] debt non-dischargeable under § 523(a)(6)" but at no time expressly indicating that willfulness and malice are distinct concepts post-*Geiger*).

As with willfulness, the Third Circuit has not since *Geiger* formally considered the definition of malice under § 523(a)(6). *In re Conte* remains the most recent Third Circuit precedential case involving § 523(a)(6); there the Court defined the requirement for a malicious injury as one which is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." 33 F.3d at 308 (*quoting In re Braen*, 900 F.2d 621, 626 (3d Cir.1990), in turn *quoting* 4 Alan N. Resnick and Henry J. Sommer, Collier on Bankruptcy § 523.16[1] (15th ed.1989)).

Yet Benun's activities relative to camera refurbishment were not without at least the color of "excuse," though not ultimately found to have been a function of "just cause."[26] Before August 21, 2001, the first sale in the United States requirement was unanticipated by all parties-in-interest, *and* the process of repair of LFFPs (as distinguished from reconstruction) was undefined. While this state of the law has not served as a defense to the reloading aspect of the patent infringement claim of Fuji (i.e., has not established "just cause" for infringement), excuse *sub judice* (by mistake or otherwise, *even when tested by*

---

**26.** In the context of tort law, "justifications" and "excuses" differ as to both state of mind and effect. 1 The Law of Torts, § 69 at 157 (Dan B. Dobbs ed., West 2001). Justifications—such as self-defense—will relieve a defendant of liability for an intentional tort when the judge believes that "people in general can rightly act as the defendant did under the circumstances that confronted him." *Id.* at 156–57. On the other hand, excuses— such as mistake—are not based on a defendant's *rightful* act; rather, "excuse" applies where "the defendant's conduct was understandable given his personal condition and that he is not personally blameworthy for matters not within his control." *Id.* at 157. Thus, while justifications "tend to invoke objective standards of reasonableness," excuses "focus on subjective mental or psychological characteristics of the actor...." *Id.* In addi-

tion, unlike justifications, excuses generally "do not furnish defenses to intentional tort claims." *Id.* The Third Circuit's definition of "malicious"—i.e., that the debtor acts "without just cause *or excuse*"—therefore would appear to require proof for § 523(a)(6) purposes that a debtor commits a wrongful act without *either* objective justification or the seemingly more subjective excuse. *Cf. Qui v. Zhou (In re Zhou)*, 331 B.R. 274, 277 (Bankr. E.D.Mich.2005) (false accusation of rape, though willful, was not malicious because debtor's schizophrenia caused her actions and she genuinely believed she had been assaulted). And, again, subjective state of mind may be established by circumstantial evidence including assessment of the acts and knowledge of "anyone of reasonable intelligence." *In re Akhtar*, 368 B.R. 120, 132 (Bankr.E.D.N.Y. 2007) (citation omitted).

*objective standards)*, is palpable. And, the related jury finding of "no willfulness" in *District Court I* drives this point home (notwithstanding no record of first sale in the United States for 90% of the refurbished LFFPs and the ultimate *absence of proofs* of process in five of the eight Chinese factories). Therefore, Fuji's ability to prove the malice component of § 523(a)(6) was, at trial outset (like willfulness), most doubtful.

### (c) *District Court Refusal to Enhance Damages and the Federal Circuit's Comments in Appeal II.*

Judge Hochberg in *District Court I* noted that "[t]he paramount consideration in determining whether to award enhanced damages is 'the egregiousness of the defendant's conduct based on all the facts and circumstances.'" 249 F.Supp.2d at 457 n. 30 (*quoting Riles v. Shell Exploration & Prod. Co.,* 298 F.3d 1302, 1313 (Fed.Cir.2002)). The District Court found that enhanced damages were not warranted for the jury verdict of *willful infringement* with respect to the *newly molded* LFFPs. *Id.* at 457. This finding was based in part, on the following reasons:

> Fuji adduced *no direct evidence* at trial that any Defendant had actual knowledge that any supplier was providing Jazz with cameras refurbished from newly-made shells, but rather relied upon an inference arising out of the fact that the cameras were sold and the credibility of Mr. Benun....

*Id.* (emphasis added).

On appeal, Fuji asserted that the District Court abused its discretion "in refusing to enhance damages for the *refurbished* LFFPs" (emphasis in original). 394 F.3d at 1379.[27] Fuji did not appeal the trial court's refusal to enhance damages for the newly made LFFPs. In denying Fuji's argument raised on appeal, the Federal Circuit focused on the jury's willfulness findings, as follows:

> Fuji has narrowly tailored its enhanced damages cross-appeal to contest damages accruing from Jazz's infringing sales between 1999 and 2001. *As Fuji itself points out, the district court did not address the refurbished LFFP sales in its enhanced damages analysis, most likely because the jury did not find these sales willful.* Rather, the district court considered the newly-made LFFP sales that the jury deemed willful infringement. While Fuji complains that the district court failed in its analysis, it does not point to any support in the record where it either requested the district court to consider the ITC determination in the enhanced damages inquiry or, in the alternative, to reconsider the jury finding that the refurbished LFFP sales were not willful.

*Id.* at 1379–80 (emphasis added).

This court is influenced by (i) the jury's finding of an absence of willful behavior by Benun in participating in the refurbishing of LFFPs, (ii) Fuji's failure to challenge that jury finding at the trial level, or to raise the issue on appeal, (iii) the Federal Circuit's ease in linking that finding to the absence of consideration of damage enhancement as to refurbishment, and (iv) the District Court's undisturbed conclusion

---

**27.** More specifically, Fuji contends that Jazz's failure to investigate its refurbished LFFP sales after the ITC issued its initial determination supports a finding of "bad faith infringement" that is a type of "willful infringement." *See Jurgens v. CBK, Ltd.,* 80 F.3d 1566, 1572 (Fed.Cir.1996). The district court did not permit Fuji to reference the ITC infringement determination during the jury trial in order to avoid prejudicing Jazz. Although Fuji does not contest the district court's evidentiary ruling, it believes that the district court should have considered Jazz's lack of investigation after the ITC initial determination in its enhanced damages analysis. *Id.*

that all the facts and circumstances of the case did not justify—even where willfulness was found—enhancement of damages. Indeed, the nonenhancement of damages even as to the newly molded cameras—i.e., that willful infringement as determined by the jury—is a telling point regarding the broad patent definition of *willfulness* and the actual state of mind of Benun in promoting sales of LFFPs.

#### (d) *The Repair Defense.*

Benun and Jazz's affirmative defense of repair in *District Court I* met with only very limited success. As to the "repair versus reconstruction" processing issue, Jazz actually proved its case for three of the eight Chinese factories doing its LFFP refurbishment work.[28] Only 4,009,937 of the nearly forty million LFFPs at issue were proven to have been repaired. Jazz did not see fit to present trial testimony as to the balance of the factories' procedures.[29]

The exhaustion *by first United States* sale component of Jazz's repair affirmative defense was divined by the jury to be 9.5% of Jazz's sales. By calculating the "intersection" of the two-component jury findings, Jazz (and Benun) were given "credit" by way of their affirmative defense for only 380,944 refurbished LFFPs. The balance of the forty-million cameras was the basis for judgment entered against the defendants in *District Court I.*

Jazz/Benun were found to have not carried their burden of proving the repair affirmative defense as to the vast majority of the LFFPs refurbished and sold between 1995 and August 21, 2001. However, (i) the complexity of the law here, (ii) the "surprise" aspect of the first sale in the United States requirement, and (iii) proof of processing requirements for three of the eight Chinese factories supplying Jazz LFFPs, are factors militating against a conclusion of "willful and malicious" injury to Fuji in Tranche I.

#### 4. *This Court's Review of Pretrial Submissions.*

Trial obstacles in this case included: the period of time covered by the claims (1995 to August 21, 2001, and then forward to December 12, 2003); the complexity of the patent issues; and the litigation and enforcement history (through ITC, District Court, Bankruptcy Court and CIT tracks).

---

**28.** At trial, Jazz adduced the following evidence on repair/reconstruction: (1) a videotape recording taken in the spring of 1998 at the refurbishing facilities of a single Jazz supplier, Boshi (the "Boshi Video"); and (2) the testimony of Mr. Lorenzini, Jazz's current Chairman of the Board of Directors, who was present during the making of the Boshi Video and who also visited two other Jazz suppliers, Peji and Ginfax, in 1997 and 1998.

Mr. Lorenzini testified at length regarding the processes exhibited in the Boshi Video. He also testified regarding the substantial similarity between the Boshi processes and the processes used at Peji and Ginfax during his visits to those factories. Based upon Mr. Lorenzini's testimony, this Court's review of the Boshi Video, and the jury's verdict in response to Question 5, the Court is satisfied that Jazz has met its burden to prove permissible repair with respect to all cameras refurbished by Boshi, Peji and Ginfax.
249 F.Supp.2d at 447–48.

**29.** Jazz presented no testimony of Mr. Benun on this issue, despite his apparent involvement in the procurement of empty shells. Nor did Jazz call Ms. Szeto, the Managing Director of Jazz Hong Kong, who testified at length in the ITC about the details of processes she had personally seen in visiting four different Jazz suppliers.

Jazz chose to rest on the Boshi video and Mr. Lorenzini's testimony. However, Mr. Lorenzini never visited any factory other than Boshi, Peji or Ginfax, and the Boshi video itself says nothing of the processes employed by any other Jazz supplier.
249 F.Supp.2d at 448 (footnote omitted).

Given all of that, written proffers and declarations of direct cases of the parties were required as a trial threshold matter.

Fuji's proposed direct case, reviewed by this court to determine the scope of trial as hearings were to begin, added nothing to the proof of Benun's alleged "willful and malicious" conduct in *refurbishing LFFPs*, up to August 21, 2001. Thus, a repetition of large segments of the *District Court I* trial, concluded in March 2003 after weeks of exhaustive hearings (covering the six-year period ending August 2001), would be contrary to the fair and efficient administration of justice. The jury—albeit applying a higher standard of proof—found Benun's conduct in inducing infringement through LFFP refurbishment, to be *not willful* (i.e., neither willful in bankruptcy terms nor even reckless in patent terms). Fuji's submissions, read in a light most favorable to Fuji, did not add to its case as to Benun's state of mind on the Tranche I injury due to refurbishment.

### 5. Conclusion—Scope of Trial of Tranche I Issues.

This court concluded at trial outset that a retrial of Tranche I injury due to refur-

bishment of LFFPs would not serve the ends of justice. The jury finding of "no willfulness" in *District Court I*, augmented by the District Court's refusal to enhance damages (even as to Benun's willful behavior), *Appeal II*'s ready linkage of the non-willfulness finding to obviate damage enhancement, the breadth of the patent law in this area (i.e., that Benun was not even found to be reckless as to LFFP refurbishment), the broad commercial practice of shell refurbishing ongoing in the marketplace (twenty-seven entities originally named in ITC I), and the complex and unsettled state of the affirmative defense of repair before August of 2001,[30] were substantially persuasive as to limiting the scope of trial. In conjunction with the aforestated persuasive factors, a review of Fuji's case as presented in writing convinced this court that Fuji could not prove by a preponderance of the evidence that Benun willfully and maliciously injured Fuji by refurbishing LFFPs in Tranche I.[31] This effectively provided Benun with a partial summary judgment on the first day

---

**30.** Fuji in *Appeal II* constructed an argument for enhanced damages based upon Jazz's alleged failure to investigate refurbishment *after* the issuance in 1999 of the Cease and Desist Order. 394 F.3d at 1379–80. This argument, deemed waived by the Federal Circuit as not having been raised in *District Court I*, is belied by the Federal Circuit's highly unusual stay of that order pending appeal, the conceptual reversal of ITC I by *Appeal I*, Judge Hochberg's clear awareness of the Cease and Desist Order when she ruled in *District Court I* against enhanced damages based upon her view of the entirety of the case circumstances, and the jury's finding of no willfulness in *District Court I*. Any effort to resurrect the argument *sub judice* as a new matter (not subsumed in this case's history) bearing on the state-of-mind issue, is thus incorrect; similarly, the argument is substantively unconvincing.

**31.** *Compare and contrast* the jury's *willful infringement* finding, (i) which arises from a single sale of a particular "Sesame Street™" product, (ii) where by finding patent law willfulness, the jury could well have concluded that Benun was "reckless" in dealing with an order created from newly molded shells, (iii) where no aspect of "malice" was part of the trial, (iv) where, in evaluating "all of the facts and circumstances," the District Court specifically refused to enhance damages (a conclusion not even challenged by Fuji in *Appeal II*), and (v) where there was no direct evidence adduced at trial as to Benun's knowledge of the use of newly molded shells (only inference derived from the actual sale, and Benun's credibility as assessed by the jury). There is thus neither a legal basis for issue preclusion nor the presence of persuasive factors which would limit the scope of trial of Benun's alleged willful and malicious injury caused by

of trial.[32] Thus, trial of *Tranche I* allegations only proceeded as to Benun's state of mind in inducing infringement through the sale of the "Sesame Street™" order of LFFPs, made from newly molded shells.

### B. *Tranche II (August 21, 2001 to December 12, 2003) Issue Preclusion.*

Fuji has contended that ITC II, finding infringement by Jazz and inducement to infringe by Benun (as well as bad faith in the violation of the longstanding Cease and Desist Order), should be given certain preclusive effect *sub judice.* Of course, the $13 million penalty assessed by the ITC enures to the benefit of the United States (not Fuji), so that there has been no liquidation of Jazz/Benun debt to Fuji in ITC II. Nevertheless, Fuji contends that certain "building block" determinations of the ITC should be adopted by this court.

Broadly, it is established that ITC decisions with respect to patent issues should have no claim or issue preclusive effect in later district court litigation. The legislative history of the Trade Reform Act of 1974 supports this view as follows:

> The Commission is not, of course, empowered under existing law to set aside a patent as being invalid or to render it unenforceable, and the extent of the Commission's authority under this bill is to take into consideration such defenses and to make findings thereon for the

purposes of determining whether section 337 is being violated.

> ... In patent-based cases, the Commission considers, for its own purposes under section 337, the status of imports with respect to the claims of U.S. patents. The Commission's findings neither purport to be, nor can they be, regarded as binding interpretations of the U.S. patent laws in particular factual contexts. Therefore, it seems clear that any disposition of a Commission action by a Federal Court should not have a res judicata or collateral estoppel effect in cases before such courts.

S. Rep. No. 93–1298 at 196 (1974) *as reprinted in* 1974 U.S.C.C.A.N. 7186, 7329. Indeed, "the ITC takes the position that its decisions have no *res judicata* effect in [district court] litigation." *Corning Glass Works v. United States Int'l Trade Comm'n,* 799 F.2d 1559, 1570 n. 12 (Fed. Cir.1986).

Given the jurisdictional limitations on the relief available in the ITC, the Federal Circuit has long held that a prior ITC decision cannot have patent claim preclusive or patent issue preclusive effect in the district court. *Bio–Technology Gen. Corp. v. Genentech, Inc.,* 80 F.3d 1553, 1564 (Fed.Cir.1996). *See also Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 851 F.2d 342, 344 (Fed.Cir.1988) ("This court has stated that the ITC's determinations regarding patent issues

---

the sale of newly molded camera shells resulting in Tranche I damages.

**32.** "[T]here is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c) (Fed. R. Bankr.P. 7056). Benun's nonwillful inducement to infringe as to Tranche I refurbishment (and the concomitant absence of malice) remove state-of-mind issues as triable facts *sub judice. See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). And, given the continuum of motions

and argument from December 16, 2005 to the first day of trial, the joinder of the parties and the court in plumbing the effects of *District Court I,* and the ample notice, briefing and argument allowed, such judgment, denying exception to discharge, was summarily awarded. *See, in particular,* July 17, 2006 transcript (docket entry 155) at 54:22–56:13; July 26, 2006 transcript (docket entry 164) at 10:9–21:14.

should be given no res judicata or collateral estoppel effect."). However, Fuji had tailored its preclusion argument before this court, contending (as it did in *District Court I*) that though *legal determinations* of the ITC were not preclusive, *factual findings* should be given preclusive effect. Judge Hochberg in *District Court I* rejected this argument, as follows:

> Plaintiffs urged this Court to adopt the position advanced by Judge Longobardi of the District Court of Delaware in *In re Convertible Rowing Exerciser Patent Litigation*, 814 F.Supp. 1197 (D.Del. 1993). Judge Longobardi held that while the Federal Circuit has decided that *legal* findings rendered by the ITC do not carry a preclusive effect, the same cannot be said of *factual* findings. *Id.* at 1204–05. This Court does not concur with this view. The decision in *Convertible Rowing* preceded *Texas Instruments*. The Federal Circuit in *Texas Instruments* had ample opportunity to distinguish between a factual or legal preclusive effect and did not do so. Nor is the analysis in *Texas Instruments* limited to legal findings. Consequently, this Court declines to follow *Convertible Rowing* and instead affords both the factual and legal findings of the ITC and the appeal thereof persuasive value only. *Cf. Minnesota Mining and Manufacturing v. Beautone Specialties Co., Ltd.*, 117 F.Supp.2d 72 (D.Mass.1999) (distinguishing *Convertible Rowing* as outdated and hinting that *Convertible Ruling* was effectively overturned by *Texas Instruments*).

*Fuji Photo Film Co. v. Jazz Photo Corp.*, 173 F.Supp.2d at 274 n. 2 (emphasis added).

This court agrees with Judge Hochberg, that neither legal determinations nor factual findings of the ITC can serve as a basis for issue preclusion. Nevertheless, there remains the question of whether and to what extent this court should consider ITC II, which fully litigated at least the patent infringement issues in Tranche II. The Federal Circuit has provided some guidance here.

> [O]nce we accept, as we have done at least since 1986, that ITC decisions are not binding on district courts in subsequent cases brought before them, it necessarily follows that accused infringers can raise whatever defenses they believe are justified, regardless whether they previously raised them and lost in the ITC. *The district court can attribute whatever persuasive value to the prior ITC decision that it considers justified.* And we, on appeal, must be free to thoroughly review the district court's decision. As a court we are bound to follow our own precedents, and, to the extent that we have previously ruled on a matter, a subsequent panel will have powerful incentives not to deviate from that prior holding, short of thoroughly justified grounds.

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir.1996) (emphasis added).

This court thus concluded (again, immediately before trial) that Tranche II claims would have to be proven fully by Fuji. However, while the findings and determinations of ITC II are not preclusive, they would be considered by this court. This is particularly the case because of the ITC's expertise in the area of patent law, its familiarity with the LFFPs refurbishment issues, and the detailed opinion rendered in ITC II. As will be discussed hereinafter, consideration of the "persuasive value" of ITC II has substantially impacted on this trial, most plainly as to evidentiary rulings. Moreover, at approximately the midpoint of the trial period (January 11, 2007), the Federal Circuit affirmed much (but not all) of ITC II.

### C. *Trial Issues.*

As a result of the threshold determination of this court, the issues remaining for trial were established as:

(i) The Tranche I state of mind of Benun (whether Benun was "willful and malicious") in his participation in the sale of 1,209,760 *newly molded* LFFPs; and

(ii) The *full array* of Fuji's Tranche II claims, i.e., whether Jazz/Benun "injured" Fuji by infringing [33] while not establishing the repair affirmative defense; if such injury be proven, the damages attributable to same; and whether such injury—if any— was "willful and malicious" in accordance with § 523(a)(6) so as to render all or any part of any damage award adjudged herein excepted from the bankruptcy discharge.[34]

These issues will be dealt with in reverse order, as fully set forth below.[35]

### IV. *Tranche II (August 21, 2001 to December 12, 2003): Claims of Patent Infringement, Inducement to Infringe, and Willful and Malicious Injury to Property per § 523(a)(6).*

#### A. Evidence Issues.

In order to understand and evaluate the persuasive effect of ITC II, this court concluded that evidence admitted in ITC II should be liberally admitted in this proceeding. Accepting same into evidence was not automatic for the ITC II exhibits, but they were given the equivalent of a rebuttable presumption of admissibility. This was particularly the case since Benun (who was the party generally on the "receiving end" of Fuji's-offered ITC II exhibits at trial here) had the opportunity to review and contest them in ITC II. *See, e.g.,* 7/26/06 Tr. at 89:20–97:23; 7/27/06 Tr. at 134:15–138:1.

#### B. Process of Refurbishing LFFPs.

##### 1. Effort to Establish a Standard for Permissible Repair Processing.

With the benefit of *Appeal III*, permissible repair processing for LFFPs becomes somewhat clearer. However, even today it is not a model of clarity. An original "eight-step" program was identified by the ALJ as common processing among the twenty-seven remanufacturers targeted in ITC I. In fact, the Commission rejected (incorrectly as it turned out) that eight-step process, thus as a practical matter denying the concept of permissible repair *for LFFPs* in ITC I.[36]

---

**33.** Benun has conceded on the record that he is not challenging Fuji's patents and that as to infringement, Benun will rely on the affirmative defense of repair.

**34.** While the "persuasive value" of ITC II's patent law determination (to the extent affirmed in *Appeal III*) should be considered by this court, the state of mind required to establish a § 523(a)(6) exception to discharge remains central to this court's role, and Fuji's unliquidated and disputed Tranche II claims were submitted by Fuji for determination here. *See* note 15, *supra.* *See also* Fuji's request for a specified damage judgment. Ex. P–181.

**35.** Trial was predictably document-heavy; volumes of exhibits were introduced into evidence; physical exhibits (LFFPs), photographs and videos rounded out the library of admitted evidence. At the conclusion of the trial, the parties were instructed to submit proposed findings of fact and conclusions of law (including an initial volley and then a rejoining submission by each side). Following these very substantial submissions, there was closing oral argument on January 25, 2008.

**36.** "*Aro Manufacturing [Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961)] and the other Supreme Court decisions which under-

The process approved in *Appeal I* is as follows:

1) [R]emoving the cardboard cover; 2) opening the LFFP body; 3) replacing the winding wheel or modifying the film cartridge to be inserted; 4) resetting the film counter; 5) replacing the battery in flash LFFPs; 6) winding new film out of a canister onto a spool or into a roll; 7) resealing the LFFP body using tape and/or glue; 8) applying a new cardboard cover.

474 F.3d at 1286 n. 1.

The eight-step processing was no magic or immutable formulation.[37] Indeed, an extended nineteen-step process (defined by Jazz in ITC II as its refurbishing technique) was sanctioned and approved in *Appeal III*. The nineteen steps were:

1) [T]esting the battery; 2) breaking the weld so that the camera can be opened; 3) opening the camera's back; 4) disengaging the film advance disabling mechanism; 5) inserting the battery in the camera; 6) cleaning the viewfinder and taking lens; 7) testing the flash; 8) resetting the film counter; 9) inserting the film cartridge and securing the back closed; 10) applying black tape to areas where potential light leakage may occur; 11) inserting a "slider" to allow film to be reloaded with its back cover closed; 12) inserting a small rod to prevent errant pictures from being taken during refurbishing; 13) inserting a film winding shaft into the film roll chamber; 14) unwinding the film out of the film cartridge and into the film roll; 15) disconnecting the film winding shaft; 16) closing the film access door and applying black tape thereto; 17) applying additional black tape to areas where potential light leakage may occur; 18) testing the film advance and flash; and 19) placing the outer cardboard packaging onto the LFFP.

474 F.3d at 1288 n. 3.

Fuji, obviously disquieted by the very thought of repair being permissible, would have every variant from the *Appeal I* eight-step process struck down. In *Appeal III*, for example, Fuji argued "that Kodak LFFPs that received *partial new backs* and LFFPs that were refurbished *without spools* should have been found to be infringing." 474 F.3d at 1289 (emphasis added). ITC II rejected these propositions. In fact, the Federal Circuit went considerably further than the ITC in expanding the scope of permissible repair. *Appeal III* provided a significant benchmark along the repair-reconstruction spectrum by accepting the concept of "spent parts" for certain full camera backs. ITC

---

lie precedent require that infringing reconstruction be a 'second creation' of the patented article. Although the Commission deemed this requirement met by the 'remanufactured' LFFPs, *precedent places the acts of inserting new film and film container, resetting the film counter, and resealing the broken case—the principal steps performed by the remanufacturers—as more akin to repair." Appeal I,* 264 F.3d at 1106 (emphasis added). *See also CIT Appeal,* 439 F.3d at 1353–55 (the 2006 affirmance of the Court of International Trade's ruling in favor of Jazz's *repair* processes with respect to a certain 2004 shipment of LFFPs, notwithstanding "various minor operations,"

unidentified but said to be incidental to much of the eight-step formulation).

37. *Appeal III* acknowledged that "there must be adequate notice of what conduct is regulated by the [Cease and Desist Order], ... and the parameters of any relevant affirmative defenses.... In this case, Benun clearly had notice [of the first sale in the United States requirement] ... *Whether he had adequate notice of the scope of permissible repair is a matter we need not decide* [because the issue was not adequately raised on appeal]." 474 F.3d at 1292–93 (emphasis added) (footnotes omitted). The "scope of permissible repair" remains fluid if not downright *vague.*

II had ruled that full-back replacement (as distinguished from partial new backs) was reconstruction; *Appeal III* reversed that finding.[38] 474 F.3d at 1295–98. In addressing the spent parts issue, the Federal Circuit drove home the point that there is a range of permitted repair activities:

> [C]ontrary to Fuji's assertion, our original decision in [*Appeal I*] did not limit the scope of permissible repair to the eight common steps it considered; rather we did not reach the question of what other activities constituted permissible repair. . . . On appeal in this case, the Commission and Benun agree that the eight step refurbishment discussed in [*Appeal I*] and the nineteen step refurbishment described in the Commission order here both involve permissible repair. The question then [answered by the Court in the negative] is whether one additional action by Jazz, the addition of a new plastic back cover, converts the activity into impermissible reconstruction.

474 F.3d at 1295–96 (footnote omitted).

Scouring *Appeal I* for examples of nonconforming refurbishing processes is unavailing: the only clearly specified offending respondent in ITC I (noted by the Federal Circuit at a key point in its opinion summary), had not refurbished at all, but rather had admitted "building new LFFP cameras in China." 264 F.3d at 1109 n. 3. *Appeal I's* reluctance to provide guidance as to when processes might tran-

scend "repair" and morph into "reconstruction" was explained.

> The Commission's ruling of reconstruction was based on the acknowledged general activities of the remanufacturers, and thus did not require evidence of whether any specific additional procedures were performed, for such evidence would not have affected the Commission's ruling. However, a ruling of repair can not be open-ended, for there is undoubtedly a stage at which permissible repair becomes prohibited reconstruction. We can not exculpate unknown processes from the charge of infringing reconstruction.

264 F.3d at 1109 (footnote 3 omitted, but referenced immediately above herein). However, *Appeal I* is not without clues (notwithstanding its resistance to specifying any set of factors to consider in assessing permissible repair).

> The Court has cautioned against reliance on any specific set of "factors" in distinguishing permissible from prohibited activities, stating in *Aro Manufacturing* that "While there is language in some lower court opinions indicating that 'repair' or 'reconstruction' depends on a number of factors, it is significant that each of the three cases of this Court, cited for that proposition, holds that a license to use a patented combination includes the right 'to preserve its fitness for use . . . .' " 365 U.S. at 345, 81 S.Ct. 599, 5 L.Ed.2d 592. Indeed, this

---

**38.** Here the back cover of the LFFPs was part of a patent directed to a combination of elements; the back cover was not separately patented. The Supreme Court [in *Aro Manufacturing*] rejected a test for repair/reconstruction that would look to whether an "essential" or "distinguishing" part of the patented combination had been replaced. . . . In doing so, the Court concluded "that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the

grant" and "that there is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent.". . . We see no material difference between the Commission's test that focused on whether an "integral" component has been replaced, and the tests previously rejected by the Supreme Court that focus on whether an "essential" or "distinguishing" part, or part that is at the "gist" or "heart" of the invention, has been replaced. 474 F.3d at 1297.

criterion is the common thread in precedent, requiring consideration of the remaining useful capacity of the article, and the nature and role of the replaced parts in achieving that useful capacity. The appellants stress that all of the original components of the LFFP except the film and battery have a useful remaining life, and are reused. *The appellants state that but for the exposed roll of film and its container, any portion of the case that was broken by the photo processor, and the winding wheel in certain cameras, the refurbished LFFP is substantially the original camera, for which the patent right has been exhausted.*

264 F.3d at 1106 (emphasis added). *Appeal III*'s reliance on the "spent parts" concept for the subject broken camera backs (partial and full) was thus consistent with *Appeal I*.

In summing up the state of permitted and impermissible LFFP remanufacturing processing to this point, the following appear to be established:

(i) The *methodology* by which LFFP shells are dissembled, refilled with new film and battery in place of the obviously spent original film and battery, is broadly permitted (whether in eight or nineteen steps or other variations of *obvious and commonsensical* techniques [39]);

(ii) Building *new cameras* (presumably by assembling all, or perhaps substantially all or major newly molded piece parts) is plainly outside repair and the permitted repair defense;

(iii) *Replacing certain piece parts* (presumably with newly molded components, as well as salvaged parts) is permitted at least where the concept of "spent parts" applies [40]; and

(iv) Replacement of spent parts (e.g., partial or full back LFFP covers), even if they are "essential" or "distinguishing" [41] nonpatented components of a patentable assembly, remains within the ambit of permissible repair (at least where "the extent of the refurbishment is [not] disproportionate to the overall value of the parts ... not replaced." [42]).

### 2. *Proof Required to Establish "Permissible Repair" Process.*

Giving only inklings of substance, *Appeal I* foretells the future for potential case-by-case (i.e., process-by-process) hearings.

---

**39.** Process patents yield to the permissible repair affirmative defense (*Appeal I*, 264 F.3d at 1108–09), much of the effort to describe steps (eight, nineteen or other) is often sheer language parsing (*see District Court I*, 249 F.Supp.2d at 446), and, most fundamentally, *this is simple, low-tech stuff.* There are plain and obvious ways to reload the LFFP; turning the technique into a doctrinal formulation, as Fuji would have it, is a lot like requiring that toast be buttered on a particular side. It is quite ridiculous; obvious reloading techniques, much like ordinary innovation in developing products at outset, should not be barred by overextending exclusive rights under patent laws. *Cf. KSR Int'l Co. v. Teleflex, Inc.*, — U.S. —, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007).

**40.** This court and other tribunals have repeatedly concluded that, in view of the continued utility of the shutter mechanism, lens, viewfinder, film advance mechanism, and other significant parts in the original camera, replacing the film is a permissible repair and reattaching or replacing a part that must be removed or broken to replace the film also constitutes permissible repair.

*Appeal III*, 474 F.3d at 1296.

**41.** Likewise, replacement of spent "integral" parts or those which are the "gist" or at the "heart" of the invention in a combination patent is acceptable as "repair." *Appeal III*, 474 F.3d at 1297.

**42.** *Appeal III*, 474 F.3d at 1296.

Thus our reversal of the Commission's decision does not apply to LFFPs from those remanufacturing facilities for which discovery was refused or where the evidence offered was found incomplete or not credible by the ALJ. For those respondents' activities that were shown to be limited to those steps considered by the ALJ ... we conclude that these activities constitute permissible repair. For those respondents who refused to provide discovery or access, or proffered incomplete or "bench" evidence (a partial display created for litigation purposes), or presented testimony that the ALJ found to be not credible or inadequate, it can not be determined from the record whether their remanufacturing activities are limited to those considered by the ALJ and on which our ruling of permissible repair is based. For those respondents, the record contains insufficient basis on which to reverse the Commission's rulings.

264 F.3d at 1109.

This same passage is quoted in ITC II as a precursor to concluding that there

was a "lack of complete and credible information *verifying* the LFFP refurbishing processes at many of Jazz's supplier factories." Ex. P–118A at 78–79 (emphasis added).[43]

Unanswered (and starkly so, now with the benefit of history), is the question: what in the reloading process would be other than "permissible repair"?

As processes for permissible repair have been reviewed by the Federal Circuit in *Appeals I, II,* and *III* and the *CIT Appeal,* the acceptability of a broad range of refurbishing has developed (see Point IV.B.1 *supra*). Fuji-driven concepts (some accepted by the ITC), including: no repair permitted at all; no repair permitted beyond the orthodoxy of a precise eight-step process; and no remolding of spent parts (such as partial or full camera backs), *have all been debunked.* Short of completely remolding the entire camera or at a minimum, the camera shell, or, as hinted by the Federal Circuit, adding spent parts of such cost or value as to exceed the worth of the parts not replaced, or *perhaps* add-

---

**43.** ITC II may have interpreted its charge from *Appeal I* as requiring *verifiable information* to establish the repair affirmative defense. (Certainly Fuji has pressed "verifiable evidence" as an essential in proving the permissible repair defense. Fuji "Proposed Findings of Fact" ¶ 113.) *Appeal III* noted that in ITC II "[t]he Commission found that 'there is a lack of complete and credible information *verifying* the LFFP refurbishing process at many of Jazz's supplier factories' and therefore that Jazz had failed to prove permissible repair cameras made at these factories." 474 F.3d at 1295 (emphasis added). However, *Appeal III* affirmed the ITC II conclusion *without sanctioning any enhanced standard of verification.* Rather, the Federal Circuit in reviewing the trial level decision deferred to the Commission which, among other things, "decline(d) to credit" the testimony of several Jazz employees and suppliers regarding how cameras were refurbished. "Benun points to

testimony by several witnesses about how the cameras were refurbished. This testimony was only from employees of Jazz and its suppliers, not disinterested witnesses, and the Commission *could* properly decline to credit it." 474 F.3d at 1295 (emphasis added). Questions of credibility are thus left to the trier of fact. In fact, ITC II did appear to find certain of the Jazz employee testimony credible when coupled with video exhibits and Fuji expert testimony, thus corroborating permitted repair at *certain* of the Jazz supplier factories. Witness Zawodny, in particular, was so cited. *See, e.g.,* Ex. P–118A at 85. Similarly, when some of the same witnesses testified in 2004 before the CIT, Jazz employee Zawodny's testimony as to processing was given credit at trial and accepted as supporting evidence by the Federal Circuit's review standard on appeal. *CIT Appeal,* 439 F.3d at 1353–55.

ing or replacing "unspent" parts (an alternative that, at least on its face, makes little commercial sense), it becomes increasingly difficult to conceive of *impermissible* repair processes. Correspondingly, *proof* of *permissible* repair becomes less difficult as accepted concepts of that repair broaden and break away from the Fuji construct. More specifically, *if* a refurbisher were to provide *credible* testimony of a witness who swore to a straightforward process, that could well carry the burden of going forward with the processing aspect of the permissible repair affirmative defense. Likewise, videotapes as direct, corroborative or illustrative proofs could support the burden of going forward with the affirmative defense, and could serve to carry the ultimate burden of persuasion if left unrebutted. Of course, videotapes are not *required* as evidence. *See Appeal III*, 474 F.3d at 1295. And, it is clear that the Federal Circuit has not been limiting the *mode* of proving permissible repair. Examination of refurbished LFFPs, for example, could well be probative. This is especially so when such simple, low-technology processes and products are involved.

LFFP reloading presents no engineering or developmental mystery. "Permissible repair" of LFFPs has now extended acceptable processing to a point short only of remolding the shells or replacing major and expensive components of the LFFP's works. This extension is a *substantive* countercurrent to the concept of any embellished proof standard advocated by Fuji, i.e., imposition of a "verification" additive to the norm of trial court evaluation of evidence's probativity. *See, e.g., Dis-*

*trict Court I*, 249 F.Supp.2d at 447–48; *CIT Trial*, 353 F.Supp.2d at 1348. A preponderance of the evidence remains the requirement to establish the affirmative defense, and embellishments of "complete," "credible," and "verifiable" would simply go to the usual evaluation and weighting of proofs as presented.

### 3. *Determination as to Processing.*

The declarations of witnesses Szeto, Zawodny and Benun support Jazz's Tranche II period compliance with Federal Circuit refurbishment requirements,[44] *as those requirements have been clarified to date.* This is especially the case, given that no magic formula for such processing is required, "spent parts" (such as partial and full camera backs) may be replaced, with newly molded parts, and the reloading process is *obvious*.

Szeto, Jazz Hong Kong's managing officer, declared fully and comprehensively that supply factories in the Tranche II period complied with Federal Circuit processing requirements. Her declarations (Exs. D–C and Y) include, in part and by way of example, the following:

Prior to the Federal Circuit Opinion, I visited many repair factories that were supplying refurbished single-use cameras to Jazz H.K., including, but not limited to, Vastfame, Ginfax, which was referred to as Leader Peak, Boshi and Company, Ltd., and Penji Jiarui Photoelectricity Company Limited, which was often referred to as Peji, and observed the production processes at those factories. In fact, the general practice for Jazz H.K. was to visit the vendor's facto-

---

**44.** *Compare and contrast District Court I,* where Judge Hochberg made the point that the *only* evidence of processing in the Tranche I period was a 1998 video of the Boshi factory (the only factory video presented there), and Jazz Board Chairman Lorenzi-

ni's testimony (which she credited as to three factories); she noted that (unlike the case here) Szeto and Benun did not testify as to process. 249 F.Supp.2d at 447–48. *See* notes 28 and 29, *supra*.

ry and observe the refurbishment processes before committing to the purchase. Between 1995 and 2000, I paid regular visits to each of the repair factories at least four (4) or five (5) times per year. (Ex. D–C ¶ 11.)

In fact, based upon my observations while visiting the repair factories, I was advised that I was going to testify at trial at the patent infringement action brought against Jazz, Jazz H.K. and Jack Benun by Fuji in the United States District Court for the District of New Jersey. I was present at trial and prepared to testify but was never called to testify by Jazz's counsel. (Ex. D–C ¶ 12.)

Subsequent to the Federal Circuit Opinion, at the direction of Jazz and Jack Benun, Jazz H.K. limited its single-use camera purchases to fewer repair factories. I was advised that this was done to ensure that Jazz could monitor and control all of the repair factories from which it acquired single-use cameras, to ensure that the repair factories permissibly repaired the single-use cameras. (Ex. D–C ¶ 13.)

. . . .

. . . [A]fter August 2001, I began to personally inspect the repair factories on a more frequent basis to ensure compliance with the processes outlined in the Federal Circuit Opinion. I am fully familiar with these processes, which I observed at the repair factories on a regular basis. I also sent Jazz H.K. employees to visit the repair factories on a constant basis to review and approve their processes. (Ex. D–C ¶ 20.)

. . . .

Beginning in late 2001, Jazz also had certain of its employees spend significant amounts of time at the repair factories to observe the repair processes. I recall that at some point beginning in 2002 or 2003, Eli Shoer and Michal Zawodny, Jazz employees, began to visit certain of the repair factories on a regular basis. (Ex. D–C ¶ 22.)

. . . .

. . . [A]fter the United States Court of Appeals for the Federal Circuit issued its opinion in August 2001 (the "Federal Circuit Opinion"), I began to communicate with and personally inspect the Repair Factories on a more frequent basis to ensure compliance with the repair processes outlined in the Federal Circuit Opinion. I am fully familiar with these repair processes, which I observed at the Repair Factories many times. After August 2001, I also sent Jazz H.K. employees to visit the Repair Factories on a constant basis to review and approve the Repair Factories' repair processes. (Ex. D–Y ¶ 4.)

Although the repair processes at the different Repair Factories differed slightly, I personally observed workers employed at all of the Repair Factories that ultimately supplied Jazz with refurbished single-use cameras utilizing some or all of the following processes:

a. removing the existing sticker and/or existing wrapper if still attached;

b. opening the plastic shell casing;

c. cleaning the camera shell and camera lens;

d. replacement of the winding wheel for certain single-use cameras;

e. replacement of the battery for flash single-use cameras;

f. testing the camera functionality;

g. resetting the counter;

h. inserting new film into the camera shell and unwinding the film;

i. closing the back cover and resealing the outer case, usually with black light-tight tape; and

j. a. adding a new cardboard wrapper. (Ex. D–Y ¶ 5.)

. . . .

During my visits to the Repair Factories, I never observed the refurbishment and reloading of Jazz's single-use camera shells that included any replacement of internal components of camera shells, such as capacitors, circuit boards, shutters, main bodies or flash tubes. (Ex. D–Y ¶ 7.)

Ms. Szeto's testimony as to her personal observations of the factory work in China, and processing requirements generally, supported her declarations and is credible. *See, e.g.,* 3/27/07 Tr. 8:19–18:15; 3/28/07 Tr. 71:24–73:19. Fuji's efforts to impeach this witness on this subject, in part veering off into Fuji's allegation that it was allowed to visit only certain Jazz suppliers, more presses its verification thesis than directly contests Szeto's declarations and testimony. Moreover, Fuji's heavily relied upon and long-serving expert witness, Mr. Bellows,[45] did not effectively put in issue either the Szeto testimony regarding process, *nor (most critically) Jazz's permissible repair of LFFPs.* In fact, notwithstanding Bellows' protracted testimony commenting on videos and sample cameras, he did not in any respect opine that Jazz's product (other than the Sesame Street™ order) included newly molded shells, newly made major components, nor that any video showed a process that was an *impermissible* repair (i.e., "reconstruction").[46]

*Likewise, this court's observation of all physical exhibits and every video, whether presented in defense or offered by Fuji to discredit Benun's affirmative defense, failed to disclose any evidence of impermissible processing, other than as to newly molded Sesame Street™ shells.*[47] All

**45.** Mr. Bellows has served as Fuji's expert since at least 1998, participating in the full enforcement history with Jazz and Benun. *See* Ex. P–L ¶¶ 1–3. This Bellows' proffer, like his testimony, fails to identify an event or example of Jazz's "reconstruction" of LFFPs in the Tranche II period.

**46.** An example of Bellows' efforts to rebut Szeto testimony related to the 2003 Jinshi factory video (Ex. P–HHHH). Though picking at some of her descriptions of factory activity and *signage* (as not being adjacent to a filmed factory assembly-line function said to be referenced in a particular sign), Bellows, again, never claimed that any activity described in the video (or any process act testified to by Szeto), was impermissible repair. *See, e.g.,* 4/26/07 Tr. 164:23–167:16. This court concludes that, though Szeto may have misunderstood or otherwise misidentified one or another video-depicted function being performed on the 2003 Jinshi assembly line, generally her testimony regarding repair was convincing. Fuji's stressing of the misdescriptions or signage issues in the Jinshi video, as an illustration of the purported unreliability of Szeto or claimed weakness in Benun's permissible repair case, is greatly overstated.

**47.** This court is fully aware of the burden Benun has in proving his affirmative defense; but, given Szeto's testimony (as well as that of Zawodny and Benun), the burden of going forward was met. Fuji's use of physical exhibits and videos and the Bellows commentary—offered to discredit Benun's case—actually strengthened this court's view that the reloading of LFFPs was a simple and obvious matter and that Jazz's suppliers were performing the obvious and permitted repair functions. Indeed, Fuji expert Bellows was most certain in identifying mold markings evidencing that the Sesame Street™ shells had been newly molded. 8/29/06 Tr. 33:24–34:16; Ex. P–L ¶¶ 15–16, 19. Yet, he never uttered a word indicating new molding of parts for any of the many other Jazz shells and cameras exhibited during trial, nor that Jazz LFFPs were even the product of a regularized process of wholesale "cannibalizing" and complete reassembly of piece parts. No Fuji witness or exhibit ever affirmatively challenged Jazz processing as being other than "repair" (though Fuji cross-examined defense witnesses on the whereabouts of spent-part camera backs as if their replacement would prove "reconstruction," that point was put to

such evidence universally illustrated a common theme of LFFP reloading in the Tranche II period which, though subject to variation, was in principle simple "repair."

Zawodny, the Jazz quality control manager, supported repair processing via declarations (Exs. D–G and W). The following declaration statements evidence that support:

> While employed at Jazz [1999 until March 2005], I oversaw quality control for Jazz. My duties [among fifteen specified functions] were to ... oversee the procedures that the repair factories used to produce single-use cameras for Jazz.... (Ex. D–G ¶ 3.)
>
> ....
>
> Between 1999, when I began working for Jazz, until the end of 2002, I visited many of Jazz's single-use camera repair factories. During my visits to these repair factories, I observed the repair processes that were used to refurbish the single-use cameras that were purchased by Jazz. (Ex. D–G ¶ 5.)
>
> ....
>
> My visits to the repair factories increased in 2003. (Ex. D–G ¶ 7.)
>
> In early 2003, Jazz began purchasing refurbished single-use cameras from Polytech Enterprises, Ltd. ("Polytech"). By early to mid–2003, Jazz had phased out many of its repair factories. During 2003, Everbest, Jinshi and Polytech were the only repair factories that supplied Jazz with its single-use cameras. (Ex. D–G ¶ 8.)
>
> When I visited the Everbest, Jinshi and Polytech repair factories in spring 2003, I videotaped the processes that I observed, which videotapes were later used in the ITC Enforcement Proceeding II litigation with Fuji. (Ex. D–G ¶ 9.)

> By late 2003, Jazz had phased out the Everbest and Jinshi repair factories, leaving Polytech as Jazz's sole source of refurbished single-use cameras. (Ex. D–G ¶ 10.)
>
> ....
>
> I, along with Eli Shoer, were the people at Jazz who were primarily responsible for ensuring that Polytech complied with the repair processes that had been approved by the Court of Appeals for the Federal Circuit (the "Federal Circuit") in its August 21, 2001 Opinion (the "Federal Circuit Opinion"). (Ex. D–G ¶ 12.)
>
> Beginning in or about February 2003, or shortly before Polytech began to supply Jazz with single-use cameras, Eli Shoer and I began to visit Polytech's repair factory on a regular basis to instruct and train Polytech's staff on the repair processes that they were to employ in producing single-use cameras for Jazz. This training continued until May 2003. (Ex. D–G ¶ 13.)
>
> Thereafter, I personally observed Polytech's repair processes on a regular basis to ensure that Polytech complied with the repair processes mandated by the Federal Circuit in the Federal Circuit Opinion. (Ex. D–G ¶ 14.)
>
> ....
>
> The workers employed at all of Jazz's single-use camera repair factories implemented repair processes between 1999 and December 2003 that I observed in connection with Jazz's refurbished single-use cameras, which included some or all of the following processes:
>
> a. removing the existing sticker and/or existing wrapper if still attached;
>
> b. opening the plastic shell casing;
>
> c. cleaning the camera shell and camera lens;

rest by the Federal Circuit partial reversal of ITC II in *Appeal III*).

d. replacement of the winding wheel for certain single-use cameras;

e. replacement of the battery for flash single-use cameras;

f. testing the camera functionality;

g. resetting the counter;

h. inserting new film into the camera shell and unwinding the film;

i. closing the back cover and resealing the outer case, usually with black light-tight tape; and

j. adding a new cardboard wrapper. (Ex. D–W ¶ 4.)

During my visits to the repair factories, I never witnessed the refurbishment and reloading of Jazz's single-use camera shells that included any replacement of internal components of camera shells, such as capacitors, circuit boards, shutters, main bodies or flash tubes. (Ex. D–W ¶ 5.)

Mr. Zawodny's 2003 videos of the Everbest, Jinshi and Polytech factories support the process aspect of a "permissible repair" defense. *See* Ex. D–28 series. *He plainly (and, in this court's view, credibly) testified that the repair processes depicted in the Everbest factory video (Ex. D–28C) were "very similar"* to those employed in *other Jazz supply factories in the Tranche II era.* 12/5/06 Tr. 55:22. Again, this series of three videos has solidified this court's view that LFFP reloading was most commonsensically done at Jazz supply factories in a manner comporting with Federal Circuit "repair" concepts. Though differences in processing persisted, the range of assembly-line techniques emphasized by Fuji through Bellows' testimony was simply variations on the same repair theme.[48]

Benun declared that Jazz was "comforted" by *Appeal I,* and "continued to refurbish and reload Fuji single-use cameras within the eight (8) common steps of repair...." Ex. D–I ¶ 32. Benun further declared that he personally visited factories in China between August 2001 and late 2004 "to ensure compliance with the Federal Circuit Decision." *Id.* at ¶ 42. Benun testified consistently with his declaration.[49] Of course, compliance with such a relatively undefined and evolving standard kept everyone guessing about process.[50]

Nothing in the testimony of rebuttal witnesses or on cross-examination of Szeto, Zawodny or Benun has, in this court's

---

**48.** Bellows' effort to discredit Zawodny's testimony and the videos was unconvincing. *See, e.g.,* 12/5/06 Tr. 55:8–22 regarding Everbest repair of Fuji shells versus non-Fuji shells—viewed by Zawodny as including "basic steps for—are the same"—and regarding similarity between Everbest repair and other factory repair—"very similar." Bellows' lengthy description of "differences" in processing, which this court does not see as discrediting the Zawodny view as to "basic steps" or being "very similar," fails to challenge any video-depicted assembly-line technique as being other than "permissible repair," and thus reinforces this court's conclusion that repair was ongoing in Jazz supply factories in the Tranche II period. *See* 4/26/07 Tr. 140:25–143:18.

**49.** Q Did there come a time that you dispatched—strike that. Mr. Benun during this period of time did you personally visit any of the Chinese repair factories?
A At which specific time?
Q 2001?
A Yes.
Q And what was the purpose of your visit to those factories? A In 2001 was to make sure that all of them complied with the law. And generally I would visit factories any way. All with the factory people. That would be the scope.
8/29/06 Tr. 264:1–10.

**50.** For example, after 2003 and the ITC II hearing, Benun ordered Polytech to stop molding replacement camera full backs, replacement *later* approved by the Federal Circuit in *Appeal III. See* 474 F.3d at 1295–98.

view, tainted or discredited their *process-supporting* statements. To the contrary, these witnesses are found to be credible in their support of repair processing and their testimony satisfies Benun's burden of going forward with the process aspect of his affirmative defense.

Videos presented (by Benun and Fuji) have not rebutted the Benun position. Rather, the videos have solidified this court's opinion that reloading LFFPs is a straightforward process (which could have many variations without becoming "reconstruction" of the camera), and, all videos viewed by this court demonstrate "repair." Similarly, the court has reviewed physical exhibits (including various refurbished LFFPs) both in conjunction with plaintiffs' witnesses' testimony and independently, and finds no evidence of a process employed by Jazz in the Tranche II period that would be other than "repair."

Fuji has not offered any evidence that "reconstruction" occurred in the Tranche II period.

 In sum, not a single frame of any video viewed by this court, nor any examination of reloaded "off the shelf" cameras or used shells, nor any testimony from either side, has even hinted at: (i) any remolding of camera bodies (as was the case with the 1998 Sesame Street™ order); (ii) wholesale replacement of camera mechanisms and electronics; or (iii) actual replacement of more than film, batteries, and some broken camera "entry doors" (partial or full backs). This court's observation of witnesses, camera shells, refurbished cameras, documents, and videos—as well as careful assessments of counsel's extended argumentation—leads this court to conclude that the preponderance of the evidence establishes that Jazz's LFFPs were "repaired," not "reconstructed" in the Tranche II period.[51]

## C. *First Sale Requirement.*

 The first *United States* sale requirement for patent exhaustion in the LFFP repair defense, announced by the Federal Circuit in 2001, was a complete surprise to participants in ITC I and most observers. The camera shells to be reloaded by Jazz must first have been sold in the United States by Fuji or its licensee in order to qualify Jazz for the repair affirmative defense.

Very much after the fact, Benun offers a partial defense of first sale by reviewing the actions of its main shell supplier, Ken Haase (and his various enterprises) in a loosely stated 1999 to 2001 period. In sum, this court finds no convincing evidence that the Haase supply *to Jazz* was comprised in any significant part of shells *derived from cameras* first sold in the United States by Fuji or its licensees. Nor does this court find persuasive the Benun argument that Fuji's shell exchange with Haase (or Fuji's licensee's exchange program with him) resulted in significant

51. Fuji's challenges to the purportedly "biased" witnesses, to certain video clips and/or comment about videos by defense witnesses, and emphasis on lack of "verification" or "verifiability" of processes, have been *fully* considered by this court, both during trial and in the months following. They simply fail to come to grips with the very broad concept of *repair* in the context of low-tech, easily understood assemblies. LFFPs are readily subject to reloading, without intricate manufacturing processes; for that common sense reason, the disposable camera shells became the business target of more than twenty-five enterprises; Jazz, probably the most active of these enterprises, performed (to Fuji's chagrin) the obvious and least costly repair on Fuji shells. "More" processing would have been both unnecessary, potentially offsetting some of the fundamental economies of the Jazz business. The defense witnesses are thus found to be credible as to process, partly because their testimony *makes sense* when one considers the marketplace.

"United States" shells finding their way into Jazz's inventory, or that the exchange itself constituted a *first sale*.[52] The purported proofs are not adequate, Mr. Haase was not produced as a witness, nor was probative documentary evidence presented to this court. (The documents that Benun did provide raised more questions about the Haase supply than they answered. *See, e.g.*, Exs. D–Z and D–AA; 7/28/06 Tr. 54:22–55–2.) In ultimate terms, Benun would wispily reconstruct the Haase supply (as if Benun did not have the burden of *proving* its affirmative defense), thus, to one or another extent, challenging the *District Court I* finding that 90.5% of shells reloaded by Jazz through August 21, 2001 were *not* first sold in the United States.

Jazz and Benun, however, did respond immediately and contemporaneously to the surprise Federal Circuit requirement by adopting and/or regenerating the "Informed Compliance Program" ("ICP"), a tracking system for acquired shells.[53] Through testimony and documentary evidence,[54] the intricacy and breadth of that program were clearly established. This court finds that the ICP was *intended* to satisfy the first sale requirement, was at least at outset *believed* by Benun and others at Jazz to have largely (but not totally) satisfied "first sale," and was substantially more than a mere formalism adopted to give the aura of compliance (as Fuji would portray it).

The ALJ in ITC II gave the ICP short shrift. He felt it was disorganized and incomplete. Moreover, though it tracked shell *collection* exclusively from United States suppliers, it did not *assure* that first camera *sales* (by Fuji or its licensees) were in the United States. Ex. P–118A 28–35, 114. The *CIT trial* judge, however, credited the ICP as *part* of a post–2003 enhanced system of first sale assurance.[55]

This court's evaluation of the ICP in the Tranche II period gives it mixed reviews. *Conceptually*, and to a certain degree in practice, the ICP had substantially more merit than the ALJ allowed. In its flowchart workings, the ICP embodied the mechanics to track shells from the United States point of collection to shipment to Asia, then to and through supply factories, and back to the United States as reloaded cameras. To the extent that domestic photoprocessors were the source of LFFP shells, there is a common sense connection between the processor and the sale of the disposable camera (at least in the absence of marketplace aberrations). The CIT identified this linkage. *CIT Trial*, 353 F.Supp.2d at 1348–49. In an effort to *quantify* this connection, witnesses Leon Silvera and Albert Silvera[56] testified to an 85% factor, i.e., that it was *industry lore* that 85% of LFFP purchasers who bought at retail stores offering film development, went back to those stores for photoprocessing. *See* 7/28/06 Tr. 243:4–246:6; Ex. D–O ¶ 8. *See also CIT Trial*, 353 F.Supp.2d at 1348 n. 7 (*citing* Leon Silvera's testimony "based on his knowledge of

---

52. Haase had, in fact, agreed at one point to salvage flash units from Fuji-exchange shells, and to recycle the plastic. Ex. P–MMM. *See also* P–TTT; 4/25/07 Tr. 10:3–19:20; 26:15–25; 40:20–41:1; 155:5–162:18.

53. *See* Exs. P–174 and D–7, depicting Flowchart and Document Names, depicting flow of product and tracking documentation.

54. *See, e.g.*, Declaration of Jazz Vice President of Operations Burkhard, Ex. D–U ¶¶ 3–14; testimony of witness Peterson (Customs Counsel to Jazz), 8/1/06 Tr. 23:10–34:19.

55. *See CIT Trial*, 353 F.Supp.2d at 1346–47 (Part IV.C).

56. Messrs. Silvera were principals of Jazz's primary shell collector in the Tranche II period, Photo Recycling Enterprises, or "PRE."

the industry, that 85% of shells are processed at the same store where the original camera was purchased," while noting that no documentary evidence supported Silvera's statement); *CIT Appeal*, 439 F.3d at 1351; *see also* Ex. D–O ¶ 8. Leon Silvera also declared *sub judice* that 80% of PRE's shell purchases came from large store/processors and another 10% to 15% from smaller independent United States photoprocessors. Ex. D–O ¶¶ 8–10. The balance of PRE's post-August 2001 shell collections (5%–10%) were said to have come from "collectors." Ex. D–O ¶ 10. (This part of Leon Silvera's declaration is not necessarily supported by PRE's documentary summary of shell collections. *Compare and contrast* Ex. D–10.)

The ICP, of course, was not a perfect filter. Previously reloaded cameras once again recycled ("reloads of reloads") were a persisting (and in this court's view, known) problem,[57] as was the possible (though very limited) contamination of domestic sales by tourist cameras (purchased abroad and brought to the United States for development). Most significantly to this court was the potential post-August 2001 evolving contaminant of market arbitraging in shells (i.e., importing shells based upon the rise in demand and price for ostensibly "domestic" camera bodies[58]). In the *CIT trial*, it was made clear that *after* 2003, Jazz instituted an inspection process at the Polytech factory in Hong Kong (by that time it's sole source of reloading); beginning in 2004 sorting was initiated in which both previously reloaded shells *and* shells with foreign language wrappers were culled out of the Jazz reloading process (at least to the extent that Jazz would market LFFPs in this country). These two enhancements in Jazz shell processing were deemed important by the CIT in its decision that Jazz had, to the extent set forth therein, satisfied the first United States sale requirement. 353 F.Supp.2d at 1348–50 (Parts V.B. and C.). However, neither component of the post–2003 changes by Jazz is present *sub judice*—yet both could have been implemented earlier.

Beyond the merit or lack of merit of the system in concept, the ICP was flawed in practice. There was a degree of disorganization surrounding the program, as well as some deficiency or lag in documentation, all as referenced in ITC II. *See* Ex. P–118A at 28–32; Ex. P–176; Ex. P–222–1; Exs. P–400–423. The purported integrity of the ICP was thus, to a certain extent, undercut by internal documentation glitches. Given the volume of the paper flow required by the ICP, the Fuji demonstration of system file problems did not, in this court's view, completely discredit the ICP. More telling to this court in terms of absence of documentation of "first sale" was the inability of Benun or Jazz's primary shell collector, PRE, to produce at trial the

---

**57.** Reloads of reloads were, basically, *Jazz*-labeled LFFPs (put together with tape and otherwise identifiable as having been refurbished); this subject drew much attention in ITC II, and the following specific comment by the Federal Circuit in *Appeal III*:

[T]here was evidence that Jazz treated substantial numbers of its own shells collected in the United States (the "reloaded reloads") as having been sold in the United States even though it knew that 90% of these shells were first sold abroad (before the first refurbishment).

474 F.3d at 1294. *See also CIT Trial*, 353 F.Supp.2d at 1334 (Point III.A.1).

**58.** Benun testified that after August 21, 2001, the cost of shells first sold in the United States increased dramatically, "40, 45 cents to 70 [cents]," 5/9/07 Tr. 158:19; *see also* 4/11/07 Tr. 65:4–11; 5/9/07 Tr. 155:4–159:18; 8/29/06 Tr. 271:19–272:10. Fuji employee Menon essentially concurred. 4/25/07 Tr. 27:20–28:6; 29:10–25; 30:1–3; 30:9–20.

required statements *certifying* that suppliers to PRE had acquired their shells from domestic sources.[59] *Compare and contrast* this deficiency with the proofs presented to the CIT. 353 F.Supp.2d at 1342 (Part IV.A.1.8) and 1348 (referencing both L. Silvera's testimony and "documentary evidence supporting it"). The absence of ICP-required certifications of "first sale" reflects more than a mere paper deficiency on Jazz's shell purchasing from its collectors.

With the dramatic run up in domestic shell prices (from about 40¢ to 70¢) after the August 21, 2001 decision of the Federal Circuit announcing the first sale requirement, "arbitrage" in shells should have been anticipated at some point, notwithstanding full implementation of the ICP. Transshipping of containers of foreign shells (at approximately 4¢ per shell, 5/9/07 Tr. 158:1–6) suddenly made economic sense *if* they could be palmed off as derived from domestic cameras. A paper tracking system (even if the documentation were impeccable) by itself could not assure first sale compliance. These market conditions, as well as the reloading of previously reloaded cameras and (probably,

most minimally) the tourist camera processing by United States laboratories, would cause "leakage" in the ICP.

Fuji presented *sub judice* much the same sampling-based case regarding first sale as it did in ITC II,[60] beefing up its analysis with additional Japanese manufacture and shipment documentation.[61] The Fuji case development of camera models and markets effectively identified "United States sale" LFFPs and "foreign sale" LFFPs by camera type. Though various conditions or events could render these identified sale markets less than absolutely certain (i.e., a foreign-intended LFFP could conceivably wind up as being sold in the United States), Fuji's position as to camera types and markets was quite strong. That position was, in this court's view, essentially unrebutted.

Fuji's proofs then parlayed the model sale site data with six samples of Jazz shells selected by Fuji employee Field at Fuji recycling sites, along with some unused Jazz LFFPs bought at retail by Fuji's counsel's investigators (as well as some units bought by Kodak employees under the direction of witness Strong).

---

**59.** Part of the ICP documentation requirements was for primary shell suppliers (basically PRE) to obtain from their various collectors certifications as to the source of shells obtained by the collectors. Ex. D–O ¶ 12; *see also* 8/30/06 Tr. 11:19–16:18. Though the Silveras were ordered by this court to search for and produce such certifications (8/30/06 Tr. 89:8–13) for the Tranche II period (as opposed to the 2004 documents provided in Ex. D–9 *and* to the CIT at trial), no certifications were found. *See* Ex. D–V, which this court finds falls short of the certification requirement.

**60.** Fuji Japan executives Ogura and/or Katsura testified: to where and when some six different Fuji LFFP types were manufactured; describing production codes (distinguishing Japan codes from United States codes); deciphering Fuji Japan production records and

coding; interpreting shipping records; and as to the sale locale of certain physical cameras (upon examination by Katsura) related to the sampling. Fuji United States employees Croker, Menon, Field and Baer weighed in on determinations of where six types of Fuji cameras were made. Employees of Fuji licensees, Konica (via Kautsky testimony) and Kodak (via Strong testimony) provided similar input. Field, in particular, testified to Fuji's United States recycling of shells and six "collections" of shells from four different Fuji shell collection facilities. These collections, done in conjunction with Fuji's efforts to stop Jazz reloading and as instructed by counsel, served as much of the basis for the ITC II "40% foreign shell" conclusion.

**61.** *See* Ex. P–VV at ¶¶ 19, 27–41; 1/26/07 Tr. 12:4–13.

Field evaluated the samples (including the new Jazz cameras) based upon his understanding of United States and foreign LFFP products. Thereafter, the same samples were examined by paralegal Bilka (and his colleague), who were retained by and operated in accordance with direction provided by Fuji's trial counsel.

Using Fuji samples and data, ITC counsel recommended to the ALJ and the ALJ accepted in ITC II, a 40% *foreign first sale* factor in the Tranche II period.[62] Ex. P–118A at 65. Benun, standing by his reliance on the ICP, leveled various attacks on the sampling testimony.

The selection process for the sampling (by Field) and his evaluation of those samples is, in this court's view, controversial. And, Bilka's counsel-programmed "analysis" (in reality, more data entry than analysis) was hotly contested by Benun. Of most concern to this court is the relatively small size of the sampling offered as evidence by Fuji: of some twenty-seven million Jazz LFFPs at issue in the Tranche II period, the 40% factor was derived from the 2003 analysis of only 2,745 Jazz cameras/shells (a number now raised to 2,851 here). Ex. P–VV ¶¶ 2; Ex. P–27; Ex. P–231. Of this number, fewer than 500 new Jazz cameras (as distinguished from Jazz shells hand picked from recycling bins) were evaluated. *See* Ex. P–118A at 60–61. Besides being skeptical about the shell sample size, this court acknowledges that Fuji employees were in a position to skew the shell collection process by making a point of collecting identifiable foreign-made LFFPs. (This, in essence, is a turn-

about of the "verification" issue pressed as to processing by Fuji.) However, Field was not shaken on cross-examination with respect to his shell collection, and results of "off-the-shelf" unused cameras (though in smaller lots), comported with results in the shell evaluation. *Consider, inter alia,* Kodak employee Strong's declaration and testimony regarding sampling. Ex. P–B ¶¶ 11–16 and 7/26/06 Tr. at 112:23–151:20; 166:21–174:3; 192:12–193:24.

Benun's objection to Bilka's testimony is, at root, a concern that Fuji's counsel "designed" this evidence. In a sense, that is true. Nevertheless, on close inspection, the program created by counsel was an appropriate syllogism which tied together the complex logic of manufacturing, shipping, sales, and sample evaluation. Each step was sufficiently proven out in court, notwithstanding Benun's assertion that the purported best evidence of first sale (i.e., shipping records of the Fuji Sales Division) was not produced. Again, though complex proofs as adduced by Fuji could have been improved, they certainly were sufficient and credible in making the case against Benun. In particular, the photographs used by Bilka to identify Japanese-made LFFPs were painstakingly (and convincingly) "squared" with actual cameras and sources. Bilka, in his limited capacity as an observer and recorder of data, was a credible witness, fairly programmed for his task.

As explained above, reliance by Benun *solely* on the unenhanced ICP and PRE's purported sourcing would not be accept-

---

**62.** Now, Fuji apparently takes the position that Benun failed to produce here *any* calculus for a first sale factor, and thus *all shells* should be deemed to have failed the first sale test. *See* Fuji Proposed Conclusions of Law ¶ 49. This court disagrees, noting Fuji's heavy reliance on ITC II (which, of course, includes the 40% finding), *and* Fuji's proofs in

this trial. Given the state of the record, it is too late in the day for Fuji to argue that Benun offered no numerical/statistical evidence of first sale and thus he should lose the "benefit" of Fuji's proofs. In sum, on the way to proving its overall case, Fuji proved the 40%/60% ratio of nonfirst sale to first sale.

able. However, Benun argues that, given Fuji's secretive programming of LFFP sales and "earmarking" (if any) with respect to marketing, the best any reloader could have done in terms of identifying first sold United States shells was to equate "sale" with "photoprocessing." Under this theory, an LFFP would qualify for first sale if its film were processed in the United States. *See* Benun "Proposed Findings of Fact and Conclusions of Law" ¶¶ 244–54. Supporting this theory, as the argument posits, is the 85% "lore factor" and Leon Silvera's statement to the effect that "after August 2001," PRE acquired between 90% and 95% of its shells from United States photoprocessors. *See* Exs. D–O ¶¶ 8–10; D–10 (PRE's shell supply summary for 2002 through 2005). This court is not convinced of the accuracy of the Silvera claim regarding 90% to 95% United States photoprocessor sourcing *as it would be applied to the August 21, 2001 to December 12, 2003 period. Benun's* Ex. D–10, when analyzed (with the benefit of the limited description provided in Ex. D–O), does not support the 90% to 95% conclusion. Moreover, Ex. D–10 leaves open to question *the site of sale* of large quantities of shells derived from sources other than the major retailers upon which the 85% lore of return was developed. And, PRE's 2001 shell supply to Jazz is not part of this "accounting."

For this court, the essential point is that neither PRE nor Jazz took any steps to sort shells in the Tranche II period so as to cull out those most obvious contaminants (shells with foreign language wrappers and Jazz's own reloads of reloads).[63] This blatant failure, in the face of the

premium being placed on domestic shells, allowed for the possibility that even photoprocessors (and more likely other shell collectors) would yield to the temptation of a marketplace pricing aberration by acquiring foreign shells in anticipation of reselling them as United States qualifying parts. PRE's collection proofs and the 85% convention simply don't compute as the weight of the evidence to establish first sale given such a marketplace potential *and* in the face of *direct evidence* of foreign shell contamination of Jazz's inventory.

Fuji's case against first sale is its survey-developed 40% factor. The 40% factor is based upon small samples taken from a sea of shells (handpicked by Fuji employees), and less than 500 Jazz LFFPs bought in retail establishments. Nevertheless, in the final analysis, this sampling is the *only direct evidence* available to this court which tests the origin of sale of actual Jazz LFFPs. Therefore, (i) in deference to ITC II and in recognition of its persuasive though not preclusive effect as to this issue, and (ii) given that the burden of persuasion (by a preponderance of evidence) weighs on Benun (and he has failed to carry that burden), this court finds that 60% of the shells at issue in Tranche II were first sold by Fuji or one of its licensees in the United States, while 40% could not be established as "first sold" in the United States.

### D. *Conclusion as to Infringement.*

Jazz infringed Fuji's patents; Benun, as Jazz's principal operator, plainly in control

---

**63.** Apparently, PRE did a certain amount of "sorting" and "sampling" in the 2001–2003 period. *See* Ex. D–O ¶¶ 15–24; 8/30/06 Tr. at 42:17–45:23; 53:21–54:1; 67:5–69:1; 124:6–128:2; 143:16–146:12; 189:20–193:21. (Whether these processes were in conjunction

with shell trading with Fuji or its licensee Kodak, or both, is not absolutely clear.) In any event, why a more discerning process of sorting was not initiated before 2004 has never been answered to this court's satisfaction by Benun or PRE's principals, the Silveras.

of the entity, induced that infringement.[64] The magnitude of the infringement in Tranche II is 40% of the sales, since 60% qualify for the "permissible repair" defense. That defense was established by a preponderance of evidence to the effect that (i) repair processes were within the acceptable range, and (ii) 60% of the shells refurbished were first sold in the United States.

In terms of numbers and dollars, judgment is rendered at the 56¢ unit damage factor developed as a "reasonable royalty" in *District Court I*.[65] From August 21, 2001 through December 31, 2002, ITC II determined that 15,957,730 LFFPs were sold by Jazz. Ex. P–118A at 90–91, n. 65. Another 11,000,000 were estimated to have been sold in 2003 through December 12. Ex. P–118A at 91, n. 67. *Sub judice*, Fuji presented proofs which varied somewhat from the ITC II Jazz sales figures. *See* Exs. P–182, P–183Y, and P–EEE (as amended and entered into evidence May 18, 2007). The August 21, 2001–December 31, 2002 total per Ex. P–EEE (as amended and as employed by this court[66]) was 16,-407,914. Though Benun continues to object to the admission of Ex. P–EEE, both sides cooperated in gathering the data from Ex. P–182 to create Ex. P–EEE as amended. They agree that Ex. P–182 (as well as Ex. P–183Y) are appropriately reflected in Ex. P–EEE. The 450,000 unit increase is attributable to a tabulation of underlying Jazz documents (part of Ex. P–182), rather than reliance on a lesser accurate summary sheet used in ITC II.

Utilizing the *Benun* bankruptcy petition date of July 2, 2003 to determine the pre- and post-petition claims of Fuji against this debtor, this court finds the following: prepetition, Benun induced infringement of the 16,407,914 LFFPs sold in Tranche II through December 31, 2002 *plus* 5,817,919 units[67] sold to July 2, 2003, for a total of

---

64. *District Court I* amply established Benun's control of Jazz. 249 F.Supp. at 458. ITC II reached the same conclusion. *See* Ex. P–118A at 101–05, 127–28. This court, having overseen the Jazz and Benun bankruptcy cases, is well aware that he was the founder, experienced camera-industry entrepreneur, and—in reality—"kingpin" of Jazz.

65. Benun challenges this use, arguing that Fuji has not provided proofs of a per unit damage factor *in this proceeding. See* Benun "Reply" ¶¶ 278–79 (Docket No. 245). However, this issue, essential to the *District Court I* trial, was decided there. 249 F.Supp.2d at 441, 452–53. Issue preclusion applies. Expert testimony in the *District Court I* trial constructed hypothetical negotiations (the Fuji witness claiming $1.09 as a reasonable royalty and the Jazz expert opining at 7.5¢). The jury decided the question at the 56¢ intermediate figure. *Id.* at 453. Indeed, it would be absurd to measure damages for infringement at 56¢ per unit sold by Jazz up to August 21, 2001, and use a different measure, e.g., for late August 2001 sales. Moreover, and even as to the latter part of the Tranche II period, no rationale for a change in this stan-

dard has been presented by Benun, nor has he presented any specifically and pointedly directed evidence showing relevant changed circumstances in the Tranche II period. Therefore, though the 56¢ rate has some potential to be "stale," it still represents the hypothetical royalty figure applied in early 2003 by the *District Court I* jury as the basis for damages, up to August 21, 2001.

66. Ex. P–EEE (as amended) serves as a composite exhibit, including 2001 and 2002 sales figures derived from Exs. P–182 and P–183Y. Where differing figures appear on this exhibit in the Tranche II period (September 2001), the lower number (516,407 units from Ex. P–182) has been used. Moreover, since daily figures were available for August 2001, the figure derived from Ex. P–182Y for the August 21–31 period (668,762 units) was utilized.

67. This total is derived by multiplying the 11,000,000 units sold in the January 1, 2003 to December 12, 2003 period, times 183 (July 2 being the 183rd day of the year), divided by 346 (December 12 being the 346th day of the year).

22,225,833 units, times the 40% factor for failure to satisfy the first sale requirement, at 56¢ per unit, or $4,978,586 of compensatory damages; post-petition, the remainder of 5,182,081 units *times* the 40% factor for failure to satisfy the first sale requirement at the 56¢ rate results in $1,160,786 of compensatory damages.

### E. *Whether Fuji Established Benun's Willful and Malicious Injury to its Property for Purposes of § 523(a)(6) Exception to Discharge in Tranche II.*

#### 1. *Burden of Persuasion.*

It is emphasized that, unlike the repair defense burden of persuasion (being on Benun), the "willful" and "malicious" allegations of Fuji must be proven by that plaintiff (and by a preponderance of the evidence). *Compare, Appeal I*, 264 F.3d at 1101-02 with *Grogan*, 498 U.S. at 286–91, 111 S.Ct. 654. At Point III.A, above, the bankruptcy standard of "willful" and "malicious" injury was described and applied to Tranche I damages; that full exposition is incorporated here as to Tranche II damage allegations.

▮▮▮▮▮ In sum, (i) exceptions to bankruptcy discharge are narrowly construed, (ii) willful injury requires that *consequences*, not merely *acts*, be intended, (iii) negligent or reckless conduct does not satisfy the § 523(a)(6) standard, (iv) the willfulness standard is either subjective intent to injure, or (on a split of authority) either objectively or subjectively measured belief that the injury is substantially certain to result from debtor's acts, and (v) the mal-ice element of § 523(a)(6), if not unified with the "willful" component, entails intent to injure *and* the lack of justification or excuse.

#### 2. *Process of Repair.*

Since this court has found that repair processes in Tranche II satisfied the repair defense requirements, analyzing Benun's state of mind in conjunction with the factory procedures in China is not necessary. However, Benun's action relative to repair processing upon learning of the August 21, 2001 Federal Circuit opinion sheds some light on his overall state of mind in the Tranche II time frame.

Benun took what this court finds to be significant remedial and/or cautionary steps in an attempt to comply with (or to demonstrate compliance with) the only vaguely stated *Appeal I* repair procedure requirements. Among these steps were: prompt notice and warning to the repair factories that *only* the eight-step approved process was to be used;[68] an admonition that improperly processed LFFPs would not be purchased by Jazz;[69] factory compliance/commitment letters were sent by Jazz to the factories;[70] provision was made for Fuji inspection of the factory sites;[71] enhanced Jazz quality control visits were instituted;[72] signs were posted in the factories depicting the permitted repair process;[73] certain videotapes of some factory processes were developed;[74] and, control over the factories by Jazz was tightened, first by reducing the number of these contractors, and, ultimately, by cen-

---

68. 03/27/07 Tr. at 82:1–17; Ex. D–I ¶¶ 41, 42.

69. Ex. D–C ¶ 18; Ex. D–I ¶ 39.

70. Ex. D–C ¶ 17; Ex. D–I ¶ 39.

71. 03/27/07 Tr. at 82:1–17; Ex. D–I ¶¶ 47, 48.

72. Ex. D–G ¶ 7, Ex. D–Y ¶ 4.

73. Ex. D–C ¶ 19; 12/05/06 Tr at 46:16–21.

74. Ex. D–G ¶ 9; 12/05/06 Tr. at 55:8–22; 68:9–19; 78:18–79:2.

tering all production in a single factory, Polytech.[75]

To one or another extent, Fuji sought to discredit or demean Benun's post-August 2001 efforts at the Chinese factories. In this court's opinion, those efforts only emphasized the disarray wrought by the vagueness of the "repair" standard; here, a relatively small business enterprise was attempting to navigate the uncertain process requirements through "proof" of compliance. On balance, this court finds that Benun fully intended to have Jazz meet the repair processing requirements of the Federal Circuit, acted in good faith in this regard, and (as previously decided) *did* meet those requirements. Given (i) the Benun/Jazz post-August 2001 efforts to prove its "repair" processing, (ii) the thoroughly vague picture of "permissible repair" in the Tranche II period, and (iii) the obviousness of the reloading process and its use among some or all of at least twenty-six of the respondents in *Appeal I*, it is clear to this court that Benun did not induce Jazz to refurbish LFFP shells in a manner, subjectively intending to have Jazz infringe Fuji's patent through any LFFP reloading process. Benun's mental state, developing in the Tranche II period, was to the contrary: this court concludes that *at least as to processing,* Benun sought to avoid further trouble with Fuji, and in furtherance of that effort took reasonable steps (and relatively easy steps) [76] toward processing requirements. *See, e.g.,* 5/9/07 Tr. 152:23–153:7. Moreover, Benun did not, *nor would a reasonable reloader of LFFP's have anticipated with substantial certainty* that the processes in use would be part of an infringing reconstruc-

tion of cameras. Indeed, the repair defense was approved by the Federal Circuit as a legal principle *and the reloading process was obvious and nonoffensive.* Excuse (given the vagueness of the developing requirements for LFFP reloading) or outright justification (as this court has found) persisted in the Tranche II era as to process. Therefore, any debt of Benun which would arise from *the process of reloading camera shells,* even if that aspect of the affirmative defense of repair had not been proven by Benun, would not have been for willful and malicious injury to Fuji within the meaning of § 523(a)(6).

### 3. *First Sale.*

Benun implemented (or activated) the Jazz ICP immediately upon learning of the Federal Circuit's announcement of the first sale (in the United States) requirement for the repair defense. The shell tracking program was detailed, comprehensive, and conceptually logical though not "airtight." In practice, as described above, there was undue "leakage" and it became something of a failure. Apparently, much of that leakage was remedied *after* 2003 by implementation of the sorting process at the Hong Kong factory of Polytech.[77]

### (a) *Factors Considered.*

Should Benun have shorn up and enhanced Jazz's ICP and shell acquisition in the Tranche II period, such that his inaction (and the corresponding act of inducing Jazz's refurbishing of camera shells not first sold in the United States) resulted in

---

**75.** Ex. D–G ¶¶ 10, 12–14; Ex. D–I ¶ 43.

**76.** In fact, in *District Court I* Benun had *proven* process compliance in three of eight factories during the Tranche I period; as to the balance of the factories there was no evidence put forth. *Contrast* the degree of difficulty in,

and attendant cost of, complying with the newly applied "first sale" requirement.

**77.** *See CIT Trial,* 353 F.Supp.2d at 1350–51 (Part V.C. and D.).

willful and malicious injury to Fuji? In answering this question, the court has considered factors which cut both for and against Benun in this regard. Favoring Benun (i.e., weighing against the willful and malicious conclusion), are the following:

(i) Jazz encountered a certain amount of chaos immediately after the Federal Circuit announced its 2001 decision but, in this court's view, did make a responsible attempt to purge its inventory and system of foreign shells (stopping shipments of refurbished LFFPs, examining warehoused inventories, air shipping shells from the United States to Hong Kong to keep supply available for the Christmas season, etc.) (*see* 7/28/06 Tr. at 58:2–18; 164:13–166:15; 171:4–6; 8/29/06 Tr. at 247:13–252:9; 10/13/06 Tr. at 21:18–24:13); this chaotic state understandably impacted on both the effectiveness of Jazz's compliance with the new first sale requirement and Benun's state of mind as he scrambled to readjust the Jazz business;

(ii) Implementation of the ICP required coordination of flow of shells and documentation; flawed as it eventually was shown to be, it obviously absorbed Jazz's limited management manpower and *generally* could have *initially* led Benun to believe (wrongly, as it turned out) that Jazz was in greatest part meeting the first sale requirement;

(iii) Gaining control of shell supplies involved very large volumes and an enormous worldwide market for LFFPs (Jazz alone was selling on average almost 1,000,000 units per month in the Tranche II period); this market context appears to have led Benun to make a businessman's rationalizations, including one to the effect that a perfect filtering system was impossible and therefore the ICP and related efforts were "good enough";

(iv) Similarly, Fuji was most secretive, protecting its product by not providing shell-embedded coding that could be read in the marketplace to aid in discerning first sale; Fuji, never wanting any refurbishing competitor to meet the Federal Circuit requirement of first sale, may well have denied the marketplace an objective readily discernible means of identifying the site of first sale;[78]

(v) Shells recycled in this country were subject to various actual or Benun-perceived sourcing which either would or could introduce foreign-made LFFPs into the United States for first sale;[79]

---

**78.** *See CIT Trial*, 353 F.Supp.2d at 1333:

> Jazz and similarly situated companies cannot reasonably be expected to have access to information that does or may exist, and would be expected to be proprietary to Fuji and the licensees, from which the location of first sale of a shell could be ascertained to a certainty. In order for the "permissible repair" exception identified and delineated by the Court of Appeals for the Federal Circuit ... to have any practical meaning in commerce, Jazz must be permitted to conduct its business such that "first sale"

may be established on the basis of evidence that is commercially available to it.

**79.** In sum, Benun includes in his many arguments: (i) that in the early part of the Tranche II period, shell supplier Haase (through his companies) had a shell exchange program with Fuji which either constituted a "first sale" by Fuji of foreign made shells in the United States, or otherwise introduced foreign shells into the United States, or both; (ii) early on (1998, etc.) the Fuji Greenwood, S.C. factory required some support through Fuji–Japan manufactured shells; (iii) infer-

(vi) To the extent that shells were supplied to "PRE" by domestic retailers who did photoprocessing, the conventional wisdom was that 85% of LFFP consumers purchasing from such retailers return their cameras for processing to these domestic sources;[80] and

(vii) To the extent that United States photoprocessing sources (both large retail establishments and others) were the largest proportion of shell sources in the Tranche II period,[81] and there is a logical connection between United States processing and United States sale of LFFPs, Benun's reliance on PRE's purchasing (and the use of the ICP) had some merit.

Running contrary to Benun's position (i.e., favoring a conclusion that injury to Fuji was willful and malicious), are the following:

(i) Benun, knowing that a substantial component of shells refurbished before the first sale requirement was announced in August 2001 would not satisfy first sale, nonetheless made no effort to cull out previously reloaded shells (until the practice of sorting out "reloads" was instituted in 2004);

(ii) Benun knew that first sold United States shells were being sold at premiums after August 2001 (prices nearly doubling, with rises of 30¢ to 35¢ per shell), thus providing an attractive market for shell arbitrage (and the potential for the importing of foreign shells to the United States, to be "palmed off" as having been first sold here)[82];

(iii) Benun has not been able to provide any of PRE's purportedly obtained certifications as to first sale *bona fides* of its purchases on behalf of Jazz;[83]

(iv) Benun/Jazz did not follow up with PRE to assure that shells provided by PRE truly qualified as having been first sold in the United States;

(v) Benun had conceded in ITC II that 5% of the refurbished shells failed the first sale test (*see* Ex. P–118A at 39); and

(vi) Benun, having developed a businessman's rationalization that the ICP and PRE's purchasing methods were "good enough," maintained that position for more than two

ences of United States "gray marketing" in foreign manufactured LFFPs; and (iv) various other potential but limited aberrations in the obvious and predominant theme that domestic manufacture was the source of United States LFFP sales. One or another of Benun's claims would give *hints* of some residue of foreign manufactured LFFPs seeping into the United States market for sale. None is conclusive.

80. *See CIT Trial*, 353 F.Supp.2d at 1348–49; *CIT Appeal*, 439 F.3d at 1351–52; *see also* 8/29/06 Tr. at 226:20–228:12; 7/28/06 Tr. at 244:11–246:6.

81. *See* Ex. D–O ¶¶ 8–11; Ex. D–10.

82. As to the dramatic rise in shell prices, *see* 8/29/06 Tr. at 271:25–272:19; *see also* 5/9/07

Tr. at 158:10–24; *compare, e.g.*, Ex. D–Z at J13335 (Right Express invoice dated August 7, 2001 pricing a Fuji 400 Flash shell at 47¢) with Ex. D–AA at JAZZ–90253 (Right Express invoice dated September 7, 2001 pricing an F400–F shell at 55¢), and Ex. D–AA at J13324 (Right Express invoice dated October 24, 2001 pricing an F400–F shell at 65¢), and Ex. D–AA at J13316 (Right Express invoice dated November 6, 2001 pricing an F400–F shell at 75¢). As to the minimal shipping cost per shell, *see* 5/9/07 Tr. at 157:23–158:9.

83. *Compare and contrast CIT Trial*, 353 F.Supp.2d at 1342 (finding No. 8), with Ex. D–V (which this court finds falls far short of "certifications" evidenced in 2004).

years following the 2001 Federal Circuit decision (introducing sorting of reloads and foreign language shells only after the December 2003 ITC II hearing).

### (b) *Evaluation of Factors.*

 For patent infringement purposes, of course, this court has already determined that Benun has not proven that Jazz had satisfied first sale through implementation of the Jazz ICP (and reliance on PRE's purchases). However, in terms of bankruptcy discharge, the introduction of the ICP serves as a strong indication of Benun's *initial* intention to comply, generally, with Federal Circuit first sale requirements. The ICP and related reliance on PRE also serves, to a certain extent, as the basis for a subjective excuse or an objectively reasonable one under the circumstances in which Benun and Jazz found themselves on August 21, 2001.[84] Nevertheless, Benun should have reflected on the flaws in the ICP and PRE's purchases, both at outset and as the Tranche II period progressed, notwithstanding that he and Jazz were under siege. Indeed, the *reloads* were at outset a known contaminant to collections; then, as ITC II was initiated, the plainest signal was provided to Benun that strict attention had to be given to the "details" of first sale. Business-based rationalization and a self-serving "good enough" standard were not adequate.

### (c) *Findings Regarding Willful and Malicious Injury in Tranche II.*

Based on the foregoing, this court finds by a preponderance of the evidence, that:

(i) Benun, upon hearing of the August 2001 decision, at outset *generally intended* to satisfy first sale requirements by having Jazz adopt the ICP and by relying on PRE and its largely photoprocessor-based supply;

(ii) Failures in Jazz's "in-house" documentation in the ICP were more a function of negligence than willful and malicious conduct; while Benun should have paid more attention to detail, he certainly was not handling the day-to-day minutia of complex shell tracking; however, at some point during the Tranche II period, it would have become apparent to any reasonable business person, and did become apparent to Benun, that PRE's shell purchases could well have been impacted by the shell arbitrage market;[85] eventually, Benun's apparent failure to enforce PRE's documentation requirements (the required certifications as to source), and otherwise inspect

---

84. The court is particularly mindful of the unrelenting pressure brought to bear on Benun and Jazz by Fuji, both before and, as heightened during the Tranche II period. In a very compressed time frame, ITC II was initiated (September 2002), *District Court I* was tried (October 2002—March 2003), and both Jazz and Benun were forced into bankruptcy (May 2003 and July 2003, respectively). And, through all these events, the law of repair was developing, generally on a *trailing basis* around Fuji's targeted competitors. Fuji, of course, continued to work incessantly through long-time counsel to develop its construct of the law, and supporting facts, as it saw fit.

85. Initially in the Tranche II period, Benun's claim to having equated United States photoprocessing with United States LFFP sales, may well have supported Benun's heavy reliance on the ICP and PRE; however, this factor "wore thin" with the sharp rise in the United States shell prices, the obvious potential of sorting out foreign language bearing shells, and the ITC acceptance of Fuji complaints as a basis for initiating ITC II in September, 2002.

PRE's purchases, was more than mere recklessness;

(iii) Shell sorting at the LFFP production point, implemented in 2004, in conjunction with the ICP, would have improved first sale compliance in the Tranche II period (and probably would have proven the affirmative defense to infringement); failure to sort, though initially negligent or at worst, reckless, became inexcusable as the Tranche II period progressed; more particularly, there came a time [86] beyond which Benun should have directed that shells still wrapped in identifiable foreign language packaging or otherwise reflecting same, be sorted out of the refurbishing process; [87] and

(iv) Benun's intentions and rationalizations in implementing the ICP, though initially contrary to willful and malicious conduct and injury in the main, could not be applied to one class of shells, i.e., the shells garnered from previously reloaded LFFPs; these shells should have been excluded from collections, at Benun's direction, immediately upon his digesting of the "first sale" requirement in August 2001.[88]

**86.** On September 24, 2002, the ITC issued its second notice of enforcement to Jazz and Benun. *See* Ex. P–118A at 9–10. This court finds that the initiation of this enforcement proceeding was a significant event, evidencing the ITC's conclusion that there was a factual and legal basis going forward against Jazz *and* Benun. Benun, knowing of his jeopardy, should have then initiated the foreign language shell sorting, rather than delaying (as he did) such sorting into 2004. That notice, and the passage of time allowing for Benun's observation of the shell marketplace, eliminated any excuse or justification Benun had with regard to sorting and tightening surveillance of PRE. For purposes of calculation of damages excepted from discharge, the court will assume that Benun shall have received and digested the ITC II notice by September 30, 2002; beginning October 1, 2002, Benun should have caused Jazz or its suppliers to have begun sorting shells as described.

**87.** Benun's various arguments that foreign language on shell wrappers or labels is not a strong indicator of the locale of first sale, are unconvincing. Fuji witnesses, including Ogura and Croker as to Fuji cameras, and, Strong as to Fuji licensee Kodak cameras and Kautsky as to Fuji licensee Konica cameras, quite credibly made the clear (and sensible) point about the language indicator. *See* Ex. P–118A at 35. *See also* 8/02/06 Tr. at 49:16–50:1, 53:7–11, 60:10–25, 63:14–64:17; Ex. P–K ¶ 14; 8/01/06 Tr. at 174:20–25; 9/01/06 Tr. at 22:4–9, 31:1–11; Ex. P–B ¶ 6; 7/26/06 Tr. at 148:19–150:19; Ex. P–NN ¶¶ 24, 26; Ex.

P–UU, 1/25/07 Tr. at 19:3–20:13; 1/24/07 Tr. at 10:16–21, 1/25/07 Tr. at 41:10–42:15, 50:14–60:23, Ex. P–NN ¶ 24. At best Benun argued via cross-examination of these witnesses, all too expansively contending that the foreign language factor was not absolute. Nevertheless, it surely was a logical basis for sorting and complying with the first sale requirement. Benun should have instituted foreign language sorting well before the 2004 date when he finally got around to it. Benun's contention that Fuji did not call the foreign language factor to his attention until the December 2003 ITC II hearing, is irrelevant; Benun's obligation was to *actively* comply with patent law.

**88.** Benun argues that somehow he believed that the Federal Circuit's ruling of August 21, 2001 was "prospective," so that a camera *both* first sold outside the United States and reloaded for the first time by Jazz *before that date* was "okay," for a second reloading after that date. This argument was unconvincingly delivered by Benun as a witness. Indeed, this point, and the corollary that no one told him about the reload of reloads issue, are business-driven rationalizations. On reflection, this court has concluded that Benun would, here and there, allow himself the "luxury" of such pretenses about patent law compliance—ignoring reload of reloads early on, and eventually not paying sufficient attention to the mushrooming of shell arbitrage.

(d) *Summary of Tranche II "Willful and Malicious" Findings.*

In sum by a preponderance of the evidence (but not by clear and convincing evidence [89]), this court finds and concludes:

(i) At outset and immediately upon the August 21, 2001 announcement of the first sale rule by the Federal Circuit, Benun *knew* that reloads of those shells *Jazz* (and perhaps others) had previously reloaded, were largely nonqualifying as first United States sales;

(ii) Given that knowledge, Benun's failure to cause the removal of previously reloaded shells from those Jazz was refurbishing, established either Benun's intent to violate Fuji's patent rights to the extent of Jazz's refurbishing of reloads, or *his* knowledge to a substantial certainty (as would *anyone* situated in Benun's position and having his experience and background), that those reloads would violate Fuji's patent rights;

(iii) There is no excuse or justification for Benun's failure to cause the removal of previously reloaded shells from Jazz's shell inventory or purchases, through a sorting process (actually undertaken in 2004) or otherwise;

(iv) Therefore, from and after August 21, 2001, Benun's inducement of Jazz's infringement is found to have been "willful and malicious" injury to Fuji to the extent of Jazz's refurbishment of previously reloaded LFFPs, and the debt arising therefrom is excepted from Benun's bankruptcy discharge pursuant to § 523(a)(6);

(v) From and after October 1, 2002 (through December 12, 2003), Benun *knew* that PRE's shell supply was subject to foreign shell "contamination" arising from market conditions (shell arbitrage and the potential for "palming off" foreign shells as United States sold);

(vi) Given that knowledge, Benun's failure to require PRE to sort, or otherwise have Jazz sort out at least the most obvious foreign shells (those with foreign language wrappers or labels) as well as reloads, established either Benun's intent to violate Fuji's patent rights to the extent of Jazz's refurbishment of all nonfirst United States sale shells (after October 1, 2002), or *his* knowledge to a substantial certainty (again, as would *anyone* situated in Benun's position and having his experience and background) that nonqualifying shells were being refurbished by Jazz in violation of Fuji's patent rights;

(vii) There is no excuse or justification for Benun's failure, by October 1, 2002, to cause the removal of foreign language shells from Jazz's shell inventory or purchases through a sorting process (again, actually undertaken in 2004) or otherwise; and

(viii) Therefore, from and after October 1, 2002, through December 12, 2003, Benun's inducement of Jazz's infringement is found to have been "willful and malicious" injury to Fuji to the extent of *all* foreign

---

**89.** The probative but limited proofs of the 40% "failure rate" of Jazz's ICP, those factors cited herein as weighing against exception to bankruptcy discharge, and various plausible but on balance unconvincing arguments in defense, render the following findings less than clear and convincing.

shells deemed to have been refurbished and sold by Jazz, and the debt arising therefrom is excepted from Benun's bankruptcy discharge pursuant to § 523(a)(6).

4. *Calculation of Portion of Tranche II Judgment Excepted from Discharge.*

(a) *Reloads of Reloads.*

The variables in calculating the measure of damages excepted from discharge in the Tranche II judgment attributable exclusively to reloads, include: the number of previously reloaded LFFPs, again reloaded and marketed by Jazz in the August 21, 2001–September 30, 2002 period; the percentage of those LFFPs which failed the first sale requirement; and, the damage rate per unit of infringing sales.

Fuji presented no direct evidence of the number of reloads of reloads Jazz sold. However, in its effort to impeach Benun, the subject was quite roundly addressed by Fuji at trial. Benun countered with his own estimates and handwritten exhibits showing certain calculations. In sum, Benun first testified that he estimated the maximum reload sale factor at 2% to 3%. *See* 8/31/06 Tr. at 16:19–25, 18:21–25:13. Exhibits D–S and D–T were more specific, with D–S showing a 2002 factor of 2.2% and D–T a 2003 factor of 2.8%. Fuji's effort to impeach Benun on this point related back to ITC II transcripts and an ALJ determination there that 20% to 30% of Jazz's LFFP shells were previously re-loaded. *See* P–118A at 143. (There, unfortunately, the ALJ cited to the ITC hearing transcript at pp. 1529–31, viewing Benun's testimony as a "concession"; however, the subject was revisited in the ITC hearing at transcript pp. 1559–60 where Benun explained his 20% reference.)

The subject of Benun's December 12, 2003 testimony (along with the percentage of reloads of reloads Jazz collected in the Tranche II period) was deeply plumbed on May 9, 2007 *sub judice. See* Tr. 5/9/07 at 131:11–144:24. Benun's testimony was plainly a function of raw estimates—he explained that in the relevant period 3% to 5% of the LFFP market was refurbished cameras. He further explained that Jazz collected 20% to 30% *of these previously reloaded cameras* and that was what he was trying to impart in ITC II when he answered the question relied on by the ALJ there.

This court finds that Benun's explanation is credible, though not justifying the purported specificity of Exs. D–S and D–T. Given the approximations involved in his testimony, the court will accept Benun's 3% to 5% reload *market share* estimate as the best indicator of reloads of reloads in the Jazz collections in the Tranche II period, assigning the lowpoint (3%) to the August 21, 2001 to September 30, 2002 period.[90]

Jazz LFFP sales from August 21, 2001 through September 30, 2002 totaled 13,564,641 units.[91] Four percent of this total

---

**90.** This court thus declines to accept both the 2.2% and 2.8% calculations of Exs. D–S and D–T (as giving the appearance of specificity where rank approximations are at their core) as well as Benun's 2%–3% August 31, 2006 testimony, in favor of the more general and believable *marketplace* estimate given by Benun at Tr. 5/9/07 at 142:9–22. The 3% lowpoint of the 3%–5% range (i.e., that part of the LFFP market comprised of reloads) was selected after taking into account Benun's testimony that CVS and Walgreens (large shell suppliers to PRE per Ex. D–10) did not sell reloads. *See* 8/31/06 Tr. at 17:1–26:13. As already indicated, this court rejects the 20% to 30% figures derived from ITC II. At best, the parties and the court are working with approximations throughout much of this case.

**91.** *See* Ex. P–EEE (as amended and admitted into evidence on May 18, 2007).

has been determined to be reloads of reloads, i.e., 406,939 units. However, not *all* reloads of reloads failed, on first sale, the United States marketing test. In fact, *District Court I* accepted 9.5% of Jazz's overall *pre*-August 21, 2001 sales as satisfying the first United States sale requirement. 249 F.Supp.2d at 452. This court will use that finding, deeming 90.5% of the 406,939 units (or 368,280 units) as infringing and damages associated with those sales as excepted from discharge.

This court considered applying the 40% factor of qualifying "first sales" to the reloads of reloads in the thirteen-month period ending September 30, 2002. That factor was generally applied for patent infringement purposes in Tranche II (*see* IV.C *supra*), a function of deference to the persuasive effect of ITC II. However, the immediate reloads at issue were a special class of Jazz LFFP sales, being marketed in the early part of the Tranche II period and either not benefiting or benefiting only minimally [92] from the ICP and other Jazz efforts at compliance with Federal Circuit requirements after August 21, 2001. Hence, this court opts for the 9.5% compliance figure (90.5% not qualifying) for all Jazz sales pre-August 21, 2001 as established in *District Court I*.

Again, the injury to Fuji should be monetized at the 56¢ per unit rate utilized in *District Court I*. Therefore, the damages excepted from discharge for sale of reloads of reloads through September 30, 2002 is $206,237. These, of course, are prepetition damages.

### (b) *October 1, 2002—December 12, 2003 period.*

The balance of Tranche II period damages incorporates the 40% [93] disqualifying first sale factor and the 56¢ per unit damage measure. Jazz sales in this period totaled 13,843,273 units, comprised of 2,843,273 for October 1 through December 31, 2002 (*see* P–EEE), and 11,000,000 units (as approximated by Benun in ITC II) for the balance (*see* P–118A at 91). Applying the factors (40% *failure* of first sale and 56¢ per unit), damages excepted from discharge are $3,100,893. Of this amount $1,160,786 is *post*-petition damages (*see* Point IV.D *supra*) and the balance, $1,940,107, is *pre*petition damages.

## V. *Tranche I (Pre–August 21, 2001): Whether Fuji Established Benun's Willful and Malicious Injury to Its Property for Purposes of § 523(a)(6) Exception to Discharge.*

 Tranche I exception-to-discharge infringement claims tried *sub judice* pertained to the 1998 sale by Jazz of *newly manufactured* LFFPs under a "Sesame Street™" license. The camera bodies were molded anew; these were *not* reloads.

**92.** No evidence established with any precision the flow of collection of reloads of reloads refurbished and sold by Jazz in the August 21, 2001 to September 30, 2002 period which were the product of "original" camera shells subject to at least one pre-August 2001 refurbishment. This court, taking into account the sale, collection, refurbishment and remarketing cycle needed to get a post-August 2001 first reloaded shell back to market, concludes that nonqualifying, previously reloaded shells from the earlier period constituted by far the largest part of the reloads of reloads refurbished by Jazz in Tranche II through September 30, 2002. Therefore, the earlier first sale noncompliance factor of 90.5% would be more apposite than the 40% factor used in the entire Tranche II period by the ALJ in ITC II.

**93.** Reloads of reloads are part of the overall 40% disqualifying sale factor utilized in ITC II. Therefore, no separate calculation is necessary for these reloads after September 30, 2002.

In *District Court I*, a judgment issued with regard to the entirety of the 1,290,760 units. Benun was found to have "willfully" induced this infringement. Given the differences in the willfulness definition in patent law (i.e., inclusive of "recklessness") and § 523(a)(6), and the absence of any malice determination in *District Court I*, Benun's state of mind as to the "Sesame Street™" cameras remained a trial issue *sub judice.*

Both Szeto and Benun testified to the circumstances of the newly molded LFFPs. Szeto testified that (i) uniformity of product was a customer requirement, (ii) she was aware that the shells were being molded anew, and (iii) she was aware that Fuji's patents were thus being infringed. 7/28/06 Tr. 176:1–178:12; 3/28/07 Tr. 64:5–65:8. This court believes that Szeto was well aware—*at all times relevant*—that the Sesame Street™ order was an infringement of Fuji's patents. Moreover, though she claimed to have communicated with Mr. Lorenzini (the then president of Jazz) about the order, Szeto and Benun were in *constant contact*; Szeto was at all relevant times Benun's "right hand" operator in Hong Kong. 3/28/07 Tr. 60:3–62:13. It is inconceivable to this court that an *atypical, licensed* order ("Sesame Street™") of more than a *million units*, would not be the subject of Benun–Szeto discussions, prior to and during the manufacturing process, *particularly* as to the shell uniformity requirement.

Benun's denials as to the newly molded shells ring hollow to this court. *See* 5/9/07 Tr. 180:24–185:13. He admitted approving the artwork for the cameras. 8/31/06 Tr. 102:20–103:2. Yet Benun denied all other knowledge of this special, infringing order,

managed in China by Szeto. His effort to shield himself from guilty knowledge of the infringement by interposing Lorenzini (who did not testify) as the project manager in the United States, in this court's judgment, fails, given Benun's character and role at Jazz. While some paperwork details (such as ICP documentation) would not be of interest to him, this special order would not—and indeed this court finds did not—escape the scrutiny and knowledge of Benun.

Benun, with knowledge that the order was being filled with newly molded shells in 1998, promoted the infringing sale of the Sesame Street™ LFFPs in 1998; his inducement to infringe was without excuse or justification and therefore the debt arising therefrom is for willful and malicious injury in terms of § 523(a)(6). That aspect of the *District Court I* judgment is excepted from discharge.[94]

## VI. *Issues of Enhancement of Compensatory Damages.*

This court will not enhance the damages awarded herein, notwithstanding (i) the "willful and malicious" injury findings of Part IV, *supra,* and (ii) the ITC II finding of Benun's "bad faith" violation of the Cease and Desist Order.

 Pursuant to patent law, the award of enhanced damages is permitted (as are attorney fees). *See* 35 U.S.C. §§ 284 and 285. Such damages and fees are awarded at the discretion of the court. *See District Court I*, 249 F.Supp.2d at 457 n. 30 and cases cited therein. Moreover, it is submitted that the bankruptcy context of this proceeding should bear on the award of discretionary damages and fees.

---

**94.** That portion of the *District Court I* judgment is the only part excepted from discharge; it carries interest as awarded but no enhanced damages. The issue of enhanced damages for the Sesame Street™ order was determined by the District Court, and should not be revisited here. *See* Part VI, *infra.*

■ The following factors have influenced the court's exercise of discretion as to fees and damages: lack of clarity in the patent law (and efforts at or degree to which there was compliance with the law); contestability and/or imprecision as to facts establishing both infringement and damages; and, the heavy toll paid by Benun over the last decade and still to be paid as Fuji relentlessly pursues him. Moreover, the case taken as a whole (including the synergy of the stated factors as well as failed but plausible arguments by Benun) militates against enhancing damages and awarding fees. All of these considerations, as well as a clear distinction between circumstances of the bad faith holding in ITC II and this case's context, lead this court to deny enhancement damages and an award of fees.

### A. Lack of Clarity in the Patent Law.

"Permissible repair" is vague, relatively undefined, and developing on a case-by-case basis. Failure to establish the repair process aspects of the affirmative defense would thus be a questionable basis for enhanced damages and fees in many circumstances. This would be the situation *sub judice* even if proofs had not been deemed adequate to establish that appropriate processes *were* employed in Tranche II on behalf of Jazz. *See* Point IV.B *supra.* The loose standard, its development on a trailing basis (i.e., after the fact of events along the time line since ITC I), and the misconceptions of the ITC as to the repair defense, engendered commercial activity which tended to test requirements of the repair defense *generally,* or to rationalize about the contours of the law. Benun—as his testimony demonstrated to this court—rationalized his way into trouble. His businessman's aggressive approach to the field of LFFP repair, after having been vindicated *conceptually* as to process by the Federal Circuit in August 2001, was wrong as to "first sale." The ICP efforts, at outset having positive compliance potential, faltered. However, on balance (and notwithstanding the extent determined herein "willful and malicious" for § 523(a)(6) purposes), Benun's conduct was less than "egregious" in light of his successful efforts at meeting appropriate repair processing and in implementing the potentially positive ICP shell collection and tracking system (which, along with PRE's purchases of shells from United States photoprocessors, brought about a certain degree of first sale compliance).

### B. Facts Establishing Infringement.

Infringement in this case is a function, exclusively, of failure of "first sale" proofs. As indicated above and throughout this opinion, to a certain degree the ICP (coupled with PRE's shell acquisition from photoprocessors) was a sufficiently credible Benun effort to reduce first sale noncompliance and to offset some of Fuji's exception to discharge contentions. The two prominent areas of exception to bankruptcy discharge not so offset have been determined to be the reloads of reloads and the post-September 30, 2002 sales. Each of these § 523(a)(6) "failures" is not sufficient to qualify as "egregious" or otherwise justify more damages and fees.

The reloads of reloads were subject to Benun's business rationalization. Though an unconvincing argument, Benun's point does emphasize that this infringing class of LFFPs has been found to be an extremely modest component of the overall infringement (and were culled from the processing by Jazz after 2003).

The post-September 2002 failure of Jazz to sort out foreign language shells (as well as reloads of reloads) and more strictly enforce its own ICP and PRE's documen-

tation of first United States sales, was likewise not "egregious." Plausible (though on balance less than convincing) points are made by Benun that (i) the ICP and PRE's shell acquisition methodology were sufficient, and (ii) foreign language shells *might*, notwithstanding the packaging, have first been sold in the United States. In addition, the point in time when Benun should have acted to shore up the ICP with sorting is subject to debate. This court focused on the ITC II notice/initiation date, but there can be no absolute in this regard.

### C. *Facts Establishing Damages.*

This court notes the relatively "thin" bases for establishing the non-first sale factors (i.e., 90.5% for early Tranche II sale of reloaded reloads and 40% overall). The 90.5% factor was a function of Lorenzini testimony in *District Court I*; that trial began in October 2002 and focused on Jazz sales from 1995 through August 21, 2001. For the reasons set forth earlier, that factor rather than the 40% first sale failure rate was applied *sub judice;* however, the lack of precision necessitated by a forced choice between these two percentages leaves open the possibility that the "real" failure rate (if even discernible) would be lower than 90.5% in the August 21, 2001–September 30, 2002 period as to reloads of reloads.

More significantly, the 40% failure rate (developed for ITC II and accepted there) was the product of some "engineering" by Fuji's long-time counsel. While having merit in its logic and appearing to be rooted in certain truths, it was unabashedly designed to satisfy Fuji's proof needs in ITC II through the gathering of shells by Fuji's employees or affiliates, and through analysis by a paralegal (Bilka) hired and programmed by Fuji's counsel. *Compare Appeal I,* 264 F.3d at 1109 (questioning

adequacy of "bench" evidence). Result orientation can creep into shell collection and selection, surveying shell samples and recording results, and analysis of results. Given the free hand exercised by Fuji (notably without "verification") in creating the survey and its analytics, this court is skeptical about adding to damages and allowing fees.

In fact, the statistical sampling that yielded the 40% conclusion is subject to serious question. Examination of recycled Jazz shells by Fuji employee (and witness) Field, was a function of six samplings ("Emerald" collection, "First Edison" collection, "Second Edison" collection, "First TIG" collection, "Second TIG" collection and "MEM" collection). The results of these collections are as follows:

Emerald—223 of 400 deemed to be foreign (56%) (*see* P–118A at 45);

First Edison—139 of 431 deemed to be foreign (32%) (*see* P–118A at 45–46);

Second Edison—94 of 274 deemed to be foreign (34%) (*see* P–118A at 46);

First TIG—114 of 400 deemed to be foreign; (29%) (*see* P–118A at 47);

Second TIG—166 of 416 deemed to be foreign (40%) (*see* P–118A at 47); and

MEM—185 of 407 deemed to be foreign (46%) (*see* P–118A at 47–48).

Overall, 39.6% of the above shells were claimed to be foreign shells not first sold in the United States. *See* Ex. P–118A at 58. The shell samples—2,328 Jazz shells selected by Field out of piles of recycled shells—has served as a basis for evaluating Jazz's sale of *27 million LFFPs* in Tranche II. Field also purchased 400 Jazz cameras in July 2003, "off the shelf" of retail stores. These were deemed to be 31% manufactured by Fuji *in Japan* and (via Bilka referring to Fuji-supplied shipping records) not shipped to the United States. *See* Ex. P–118A at 60. In April

2003, Fuji's licensee, Kodak (under the direction of witness Strong), purchased sixty-eight new Jazz cameras in retail stores. Twenty-eight of these were subject to question (about 40%, though ITC II concentrated on fourteen of these shells manufactured by Fuji in Japan). *See* Ex. P–118A at 60–61.

In grand total, including all shells and new cameras examined, the gross sampling upon which the 40% factor was determined was 2,796. This minor amount, and the personnel and methodology of shell/camera selection and sampling analysis, leave open the possibility that the 40% factor is overstated. Indeed, Benun had insisted throughout ITC II that the foreign shell mix was 5% (though Benun has not offered any counterpoint proofs, as distinguished from attacks on credibility, to the 40% factor).

Thus, to the extent that the referenced damage factors though adequately established are less than convincingly clear, and in the circumstances of this case, enhanced damages and fees should not be awarded.[95]

### D. *Effect of Judgments, Penalty and Bankruptcy on Damage Enhancement and* Fees.

Benun's inducement of Jazz's infringement has cost him dearly. Jazz has been forced into bankruptcy and liquidated. He is now in a Chapter 7 case, subjected to the bankruptcy liquidation processes.

In addition, of the multimillion dollar awards against him, more than $4 million will be excepted from discharge as a result of this proceeding, *and* the ITC II penalty of more than $13 million remains on the horizon for exception-to-discharge deter-

mination.[96] Interest on the Tranche I judgment excepted from discharge here will continue to run, as will post-judgment interest on that aspect of this court's judgment excepted from discharge for Tranche II claims. *See* Point VII, *infra.* In this court's view, the net result without enhancement of damages or fees suffices.

### E. *Case, Taken as a Whole, Does Not Warrant Enhanced Damages.*

Overall, this court reiterates that the preponderance of the evidence supports the Fuji-oriented variables necessary both to establish Benun's inducement to infringe to the extent set forth herein, as well as the more limited finding of exception to discharge. However, there is no science to, nor *conclusive* exposition of facts underlying these conclusions. Fuji, having so made its case, has *not* made any portion of its case by clear and convincing evidence.

More specifically, Benun made out his case for the affirmative defense of "repair" for almost 60% of Jazz's Tranche II sales; as to the balance, Jazz's processing passed muster, though first sale could not be established. The tracking system, Jazz's ICP, had some merit. Even the absence of sorting to exclude foreign language and reloads of reloads shells, without justification or excuse as to the latter from August 21, 2001, and the same for the foreign language shells after September 2002, was not "egregious" behavior. This is so, notwithstanding the limited finding of exception to discharge based upon a "willful and malicious" injury determination by a pre-

---

95. The court notes, as well, that the 56¢ per unit damage rate has some potential to be stale.

96. This court takes notice of the adversary proceeding pending here, initiated by the United States against Benun for the purpose of excepting the $13,128,000 ITC II penalty from Benun's bankruptcy discharge.

ponderance of the evidence.[97]

This court will not exercise its discretion to enhance damages, given the totality of circumstances of this case.

### F. *"Bad Faith" Finding of ITC II Compared and Contrasted.*

In ITC II, it was found that Jazz and Benun had violated the Cease and Desist Order *in bad faith*.[98] (The bad faith finding was not discussed in *Appeal III*.) It was found that Jazz and Benun had failed to "take 'energetic steps' to do 'everything in their power'" to avoid infringing Fuji's patents. *See, generally*, Ex. P–118A at 114–15.

■ The good or bad faith of the violator of an administratively issued injunction is an important factor in assessing the appropriate penalty. *United States v. Phelps Dodge Indus., Inc.*, 589 F.Supp. 1340, 1363 (S.D.N.Y.1984). "[I]f a violation of an FTC order is merely the result of mistake, inadvertence, or even ordinary negligence, there is little reason for impos-

ing a substantial penalty." *United States v. J.B. Williams Co.*, 354 F.Supp. 521, 551 (S.D.N.Y.1973), *aff'd in part, rev'd in part o.g.*, 498 F.2d 414 (2d Cir.1974). On the other hand, if a defendant willfully violates *or* acts with "reckless disregard of the injunctions in the order, there is every reason to impose a penalty at or near the maximum prescribed." *Id.* In *Phelps Dodge*, the defendant fell short of establishing a good faith attempt to prevent violations of a cease and desist order because its compliance programs were too lax (defendant's employees were not advised of the existence of the order). 589 F.Supp. at 1364. While the corporate defendant was *not found to have violated the order willfully*, it was found to have failed to abide by the strict terms of the injunction, "even when suspicious circumstances came to light." *Id.* at 1364–65. Bad faith was thus found because of the failure to take the "energetic steps" to effect compliance necessary to a showing of good faith. *Id.* at 1367. *See also Smith Int'l*, 718 F.2d

---

97. This court does not see the need, given its view of the case as a whole, to engage in an extended analysis of the issue of Benun's "willful inducement to infringe." Even if all or a portion of Benun's behavior underlying the damages excepted from discharge herein were (i) deemed to be at least reckless (the lesser willfulness standard of patent law than that of the Bankruptcy Code's "willful and malicious" requirement), and were found to be established by (ii) clear and convincing evidence (the heavier burden imposed by the patent law for willful infringement), this court would deny enhanced damages and attorneys' fees to Fuji. *Compare District Court I*, where willful infringement was found but exemplary damages were denied. 249 F.Supp.2d at 457 n. 30. In fact, failure to sort reloads of reloads and foreign language shells—the bases for exception to discharge—though *beyond* "reckless" (the first at outset in August, 2001 and the latter thereafter)—were nonetheless not proven as to Benun's state of mind, by clear and convincing evidence. Indeed, much of this case involves intricate and

"close calls," based often on approximations and/or sampling. Moreover, independent of the stripes of "willfulness" applicable here, this court would not, under the totality of the circumstances of this case, consider Fuji's proofs or Benun's conduct as warranting the award of enhanced damages and attorney fees.

98. In pertinent part, ITC II states:

Respondents subject to a cease and desist order have "an affirmative duty to take 'energetic steps' to do 'everything in their power' to assure compliance, and this duty not only means 'not to cross the line of infringement, but to stay several healthy steps away.'" [Cites to ITC Opinions omitted.] The Federal Circuit has further articulated such a position, stating that "the burden of avoiding infringement at the risk of contempt falls upon the one enjoined." *Smith Int'l. Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 n. 8 (Fed.Cir.1983). Ex. P–118A at 113.

at 1581 n. 8; *Chase Indus., Durus Div. v. Frommelt Indus.,* 806 F.Supp. 1381 (D.Iowa 1992).[99] As an injunction enforcement proceeding, ITC II incorporated this strict standard.

The matter here at bar is not a function of government enforcement of a cease and desist order; rather, it is an infringement case where *a portion* of the inducement to infringe was found to satisfy, by a preponderance of the evidence, the exception to discharge standard of § 523(a)(6).[100] This court has not found a *willful* inducement to infringe under the patent law's heavy standard of clear and convincing evidence. Though respectful of the ITC, this court is not bound by ITC II. To the extent indicated herein, this court disagrees with the ITC both as to Benun's efforts to comply with the August 2001 Federal Circuit decision, and the degree to which he actually complied. Therefore, the "bad faith" finding of ITC II should not be a basis for enhancing damages or awarding attorney fees to Fuji.

## VII. *Interest on Claims; Attorneys' Fees and Costs.*

 Benun contends that § 502(b)(2) of the Bankruptcy Code stops the running of interest on Fuji's claims, as of the July 2, 2003 petition date. While it is true that interest post-petition on unsecured claims cannot be charged against the *estate in bankruptcy,* interest on debts excepted from discharge continues to run against the *individual debtor. See* 4 ALAN N. RESNICK AND HENRY J. SOMMER, COLLIER ON

BANKRUPTCY § 502.03(3)(b), and cases cited therein.

In this case, interest continues to run *against Benun* on the *District Court I* judgment for *Tranche I* damages (i.e., as to the Sesame Street™ cameras). That interest accrues (*against Benun*) at the rates allowed in the New Jersey Court Rules (4:42–11) for that portion of judgment excepted from discharge.[101] Post-judgment interest will apply to both pre-petition *Tranche II* claims to the extent excepted from discharge, and post-petition Tranche II claims (all of which happen to be so excepted), as reduced to judgment here. *See, generally, Leeper v. Pa. Higher Educ. Assistance Agency (PHEAA),* 49 F.3d 98, 102–03 (3d Cir.1995) (relying on *Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964)); *See also Johnson v. Internal Revenue Service,* 146 F.3d 252, 260–61 (5th Cir.1998); *Int'l Asset Recovery Corp. v. Thomson McKinnon Sec., Inc.,* 335 B.R. 520, 526 (S.D.N.Y. 2005). Rates shall be as allowed in 28 U.S.C. § 1961, and this post-judgment interest shall compound annually.

 This court will exercise its discretion and not award *prejudgment* interest on the Tranche II damages excepted from discharge, nor will the court award to plaintiff counsel fees and costs. *See* 35 U.S.C. § 284. The rationale for denying enhanced damages applies here as to any such interest, fees and costs. *See* Part VI, supra.

---

99. ITC II's application of the "safe distance away" from infringing a patent which is the subject of a cease and desist order, is consistent with the Federal Circuit's opinion in *Paper Converting Mach. Co. v. Magna–Graphics Corp.* 785 F.2d 1013, 1016 (Fed.Cir.1986).

100. The "safe distance away" standard does not coincide with that of the "willful and

malicious" definitions of § 523(a)(6) of the Bankruptcy Code. *Consider Geiger,* 523 U.S. at 61–64, 118 S.Ct. 974; *In re Conte,* 33 F.3d at 305.

101. Apparently, in *District Court I* the parties stipulated to the use of the New Jersey interest rule *rate.*

■ In the typical patent infringement case, prejudgment interest should be awarded. *General Motors Corp. v. Devex Corp.* 461 U.S. 648, 657, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). But this general proposition, on its face, allows for the atypical or extraordinary case. *See* 461 U.S. at 658–59, 103 S.Ct. 2058 (J. Stevens concurring); *compare and contrast Bio–Rad Labs. Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed.Cir.1986). The case at bar is not typical, particularly as the repair affirmative defense developed (and is developing) in the disposable camera field. It is also a case which is "thin" in its margin of proof of damages. Award of prejudgment interest, fees and costs would in effect expand damages, the weakest area of plaintiff's proofs.

The bankruptcy context of this case cannot be set aside when considering additives to debt excepted from discharge. *See In re Wood*, 309 B.R. at 757 (denying prejudgment interest but awarding attorneys fees in patent infringement exception to discharge case). Nor can the Fuji–Jazz–Benun history be ignored: Fuji pursued the LFFP refurbishers, most relentlessly as to Benun and Jazz as they resisted. Though Benun and his company scored some conceptual points (notably overcoming Fuji's basic thesis that LFFPs could not be "repaired"), and met with some degree of success *sub judice*, the *ultimate* results have been catastrophic for Benun (and Jazz). Fuji could never have hoped to recover its full measure of damages and

costs. Rather it sought the result it got— at what by any measure was a *huge investment* in attorney time and related costs. Money, in terms of interest or expenses, was not the Fuji object. Market position relative to LFFPs was important to this plaintiff, but seemingly paramount to Fuji is its image as a fierce protector of its patent rights. Within the bounds of propriety, patent holders have the right to fund epic litigation. However, courts are not required to accede in the bludgeoning of a thoroughly downed adversary.[102]

In fact, Benun's resistance to Fuji's contentions in this adversary proceeding was reasonably effective—more than half of Fuji's claim to infringement damages was, in this court's view, disproved by Benun. The lion's share of Fuji exception to discharge assertions has been rejected here (i.e., all of the now considerably more than $20 million of Tranche I LFFP reconstruction damages plus over three-quarters of those sought for the Tranche II period). *See* Ex. P–181. Hence, *delay* in resolving Fuji–Benun issues must be attributed to the patent holder as well as the inducer of patent infringement. The same is true as to the extraordinary cost of this case and the odyssey of litigation preceding and paralleling it. In sum, Fuji at the very outset *overstated* its patent rights (wrongly claiming the repair concept did not apply to LFFPs), to some extent continued to overstate its position thereafter, succeeded in *District Court I*, then in *ITC II*,

---

**102.** Both Fuji and Benun would likely contest the casting of Benun as being "thoroughly downed." Benun, starting "fresh," is attempting to get back into the camera business through the post-Jazz formed family-owned entity, "Ribi Tech." Fuji is hot on his trail, initiating the ongoing *Ribi Tech* case. Indeed, Fuji, self-righteous in the pose of a stalwart protector of patent rights (as it would interpret them), characterizes Benun as a pirater of those rights, who must be punished to the fullest extent conceivable. Benun, having an exaggerated view of himself as a champion of freedom in the marketplace, battles with a giant of the camera world. Courts, obligated to resolve justiciable disputes put before them, need not be drawn into assessing such characterizations, which are very often mutually wrongheaded. Unfortunately, such wrongheadedness can, by deepening disputes, have the effect of draining limited public resources.

drove its prey to ground, but again, in this court's view, overstated its positions regarding infringement and exception to discharge here. No damages additive is warranted given the totality of this history and circumstances.

## VIII. *Summary/Conclusion.*

Tranche I injury arising from Benun's inducement of Jazz's patent infringement by refurbishing LFFPs (i) not "willful" as found by the *District Court I* jury (under the more rigorous "clear and convincing" evidence standard), and (ii) as determined here after a pretrial review of Fuji's proposed direct case, was not "willful and malicious." Damages for that inducement are therefore *not* excepted per 11 U.S.C. § 523(a)(6) from the bankruptcy discharge. Though issue preclusion based upon the *District Court I* determination did not apply, the finding there of no willful inducement is persuasive, and this court's review of Fuji's case as to Tranche I LFFP refurbishment (to the extent deemed to be "reconstruction") is, as to Benun's state of mind, conclusive.

Tranche I injury and the resulting damages to Fuji arising from Benun's inducement of Jazz's infringement for manufacturing (not refurbishing) certain "Sesame Street™" LFFPs, *is* excepted from discharge. The injury was "willful and malicious" as those terms are used in § 523(a)(6). While *District Court I* found this inducement "willful," that finding (by clear and convincing evidence) could well have been a function of a jury finding of recklessness. Here, however, this court finds that, by a preponderance of the evidence, Benun knew that Fuji would be injured by the infringement, and that Benun acted in this regard without excuse or justification. The *District Court I* judgment for the Sesame Street™ camera infringement, including interest as awarded,

will not be discharged in bankruptcy. That judgment will remain undisturbed in all respects.

In Tranche II, Benun's inducement to infringe has been determined and liquidated. Fuji's liquidated claim is in the principal amount of $4,978,586 for damages accruing before Benun's July 2, 2003 bankruptcy petition filing date, and $1,160,786 post-petition.

A portion of the Tranche II judgment will be excepted from discharge under § 523(a)(6). Specifically, $206,237 is determined to be the compensatory damages for Benun's inducement to infringe by reloading previously reloaded LFFPs in the August 21, 2001 through September 30, 2002 period. In addition, $1,940,107 of Fuji's claim is determined to be excepted from discharge, attributable to the period from October 1, 2002 to the July 2, 2003 petition date. Post-petition, $1,160,786 is likewise excepted from discharge.

No prejudgment interest has been awarded to plaintiff, nor is there any award for enhanced or punitive damages, or any counsel fees or costs.

This court will issue its Order and Judgment consistent with this opinion.